**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| **DIANE HAWKINS, individually and on behalf of all of those similarly situated,**<br>2129 Brett Lane<br>Obetz, OH 43207<br><br>AND<br><br>**ETHAN RYDER, individually and on behalf of all of those similarly situated,**<br>8211 Russet Lane, Apt. H<br>Maineville, Ohio 45039<br><br>      Plaintiff<br><br>v.<br><br>**WELLS FARGO BANK, N.A.**<br>℅ Corporation Service Company, Registered Agent<br>50 W. Broad Street, Suite 1330<br>Columbus, OH 43215<br><br>      Defendants | Case No. 19-cv-638<br><br>Judge<br><br>Magistrate Judge<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND ENDORSED HEREIN** |

### I.      NATURE OF THE CASE

1.      This case seeks recourse for the hundreds of borrowers who suffered as a result of Wells Fargo Bank, N.A.'s ("Defendant's") uniform and automated "calculation errors," which caused Defendant to wrongfully deny loan modifications to hundreds of consumers, many of whom lost their homes to foreclosure.

2.      Defendant, one of the largest lending and loan servicing institutions in America, services residential home mortgages. Among other things, Defendant provides mortgage loan modification services to consumers who have defaulted on their mortgage.

3.     Defendant uses mortgage loan modification tools to create automated calculations and determine whether default consumers are eligible or qualified for loan modifications under Government Sponsored Enterprise ("GSE") and federal agency requirements.

4.     Between 2010 and 2018, Defendant failed to detect multiple systematic errors in its automated decision-making tool. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet Defendant not only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years on end.

5.     Defendant was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether homeowners met threshold requirements. If Defendant was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

6.     As a result of Defendant's deficient auditing and compliance procedures, Defendant repeatedly violated HAMP and other government requirements over a period of at least eight years and denied Plaintiff Hawkins' and Plaintiff Ryder's modification that Defendant was legally required to offer.

7.     Defendant failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in Defendant's mortgage modification and foreclosure practices.

8.     The OCC found, among other things, that Defendant had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

9.     Defendant agreed to correct these deficiencies in two 2011 consent orders. Defendant pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that Defendant's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied. Defendant also promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

10.     In one of the consent orders, the Federal Reserve ordered Defendant to take steps to ensure that it complied with its obligations under the consent orders, including by strengthening oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve compliance information and reports.

11.     Defendant was supposed to make sure that Defendant conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. They repeatedly failed to fulfill these obligations over the course of several years, however—in violation of the promises they made in the 2011 Consent Order and in callous disregard of the well-being of their customers.

12.     Four years after Defendant agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that Defendant was still in continuing noncompliance. Among other things, the OCC found that Defendant had not maintained ongoing testing for compliance with HAMP

and other government requirements; had not ensured that its audit and compliance programs had the requisite authority and status so that deficiencies in mortgage modification and foreclosure practices would be identified and promptly remedied; and had not ensured that it was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' homes.

13.     In response to Defendant's ongoing violations of the 2011 Consent Order, the OCC prohibited Defendant and its parent company from growing its residential mortgage servicing business until it brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Defendant, the nature and severity of which would depend on the nature, length, and severity of Defendant's continued noncompliance with the amended consent order.

14.     As a result of Defendant's continuing failure to implement adequate auditing and compliance procedures, Defendant failed to catch an error in its mortgage modification software that led Defendant to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Defendant's parent company to pay a civil money penalty of $70 million.

15.     Defendant's parent company accepted the $70 million penalty and acknowledged the error that led Defendant to wrongly deny mortgage modifications to 184 customers in 2013-2014.

16.     Indeed, unbeknownst to the OCC, Defendant had discovered another error in its mortgage modification software in August 2013—one of the errors at issue in this case—which caused Defendant to wrongly deny mortgage modifications to 625 customers. Defendant and its parent company decided not to tell anybody Defendant had discovered this error—likely as part of

an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision under the 2011 Consent Order and lift the business restrictions it had imposed in 2015 and to avoid civil liability to those wronged homeowners.

17.     To make matters worse, even after discovering the 2013 error, Defendant continued using the faulty mortgage modification software to assess borrowers' eligibility for modification options for more than two years. Defendant did not implement new controls until October of 2015. And it did not disclose the error to federal regulators or the public until August of 2018.

18.     Moreover, despite discovering the error in 2013 and eventually implementing new controls in 2015, Defendant still did not reform its auditing and verification practices. Related errors that would affect an additional 245 customers were not discovered, remedied, or disclosed until 2018.

19.     Defendant's failure to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Defendant and its parent company intentionally abandoned their oversight responsibilities—and did so to a shocking degree. And until they were caught red handed concealed those failures.

20.     Defendant repeatedly promised to reform its central oversight as part of its settlements with the government. Each time, it failed to live up to those promises and continued to abdicate its oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law.

21.     Defendant's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018,

the Federal Reserve Board announced that it would prohibit its parent company from expanding its business until it sufficiently improves its governance and controls.

22.     In its Cease and Desist Order to  the Federal Reserve Board found that Defendant and its parent company had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

23.     Defendant's parent company was ordered to submit a plan for reforming oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary to oversee Defendant's execution of its compliance control program.

24.     Defendant's parent company was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

25.     Until these plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Defendant and its parent company are subject to an asset cap that restricts the company from growing larger. 63. As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

26.     A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Defendant finally disclosed the 2013 error—first to its shareholders in its parent company's Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error. Wells

Fargo & Company wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. Wells Fargo & Company also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

27.     Three months later, in its next Form 10-Q, Wells Fargo & Company disclosed that Defendant had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Defendant claims "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

28.     Defendant's long-overdue review of its automated mortgage modification software is apparently still not complete. In its recently filed 10-K Annual Report, Defendant's parent company disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

29.     To compound matters during his testimony on March 12, 2019 in the United States House of Representatives Financial Services Committee, Timothy Sloan had the following exchange with Rep. Joyce Beatty:

> In your 10-Q filing from August 2018, your company stated that "an internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015 when the error was corrected. Additionally the filing stated, "as a result of this error, approximately 625 customers were incorrectly denied a loan modification...in approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered loan modification, a foreclosure was complete." Wells

Fargo later updated those numbers to 870 customers who were incorrectly denied a loan and your company had improperly foreclosed on 545 of these customers.

What explains the gap between identifying the error in October 2015 and disclosing the error nearly 3 years later in August of 2018?

**Response of Timothy Sloan:** Wells Fargo did not disclosure the calculation error in the Home Preservation Application ("HPA") tool in October 2015 because a review of a sample of accounts at that time showed the error had not harmed customers. In 2018, while reviewing an unrelated issue, Wells Fargo re-reviewed the HPA tool error and determined that, in fact, it had impacted loan modification decisions between April 2010 and October 2015. Wells Fargo then disclosed this information in its second quarter 10-Q filing in August 2018.

## II.    PARTIES

30.    Representative Plaintiff Diane Hawkins. DIANE HAWKINS formerly known as Diane Jaynes, is a natural person and citizen of Ohio residing in Franklin County ("Plaintiff Hawkins").

31.    Plaintiff Hawkins owned that certain real property located at 1122 Viewpointe Dr. Columbus, Ohio 4327 (the "Hawkins Property") from April 22, 2004 until a foreclosure was completed on July 23, 2015.

32.    Plaintiff Hawkins has agreed to act as Class Representative in this matter.

33.    Representative Plaintiff Ethan Ryder. ETHAN RYDER is a natural person and citizen of Ohio residing in Warren County, Ohio ("Plaintiff Ryder").

34.    Plaintiff Ryder owned certain real property located at 521 Tusculum Avenue, Cincinnati, Ohio 45226 (the "Ryder Property") from March 27, 2009 until August 12, 2013

35.    Defendant Wells Fargo Bank, N.A. WELLS FARGO BANK, NATIONAL ASSOCIATION is a federally-chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in Sioux Falls, South Dakota ("Defendant"). Defendant is subject to the supervision of the Comptroller of the Currency

of the United States Department of the Treasury and is deemed a citizen of South Dakota pursuant to 28 U.S.C. § 1348.

36.     Defendant executes contracts across the United States and in the State of Ohio, including the loans at issue with the Hawkins Property in Franklin County, Ohio and the Ryder Property in Hamilton County Ohio.  Defendant regularly engages and transacts substantial business across the State of Ohio.

37.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) as the Plaintiffs are both citizens of Ohio, the Defendant is a citizen of South Dakota and/or California and the amount in controversy $75,000.00.3

38.     This Court has personal jurisdiction over Defendant. In addition to the substantial business Defendant conducts in Ohio, Plaintiff Hawkins' contract with Defendant was executed in the Southern District of Ohio, Eastern Division regarding real property located in the Southern District of Ohio, Eastern Division. Plaintiff Ryder's contract with Defendant was executed in the Southern District of Ohio, Western Division regarding real property located in the Southern District of Ohio, Western Division. Further, Defendant has breached contracts with people located in Ohio regarding real property located in Ohio and Defendant has caused injuries in Ohio.

39.     This district is the proper venue for this action as Defendant resides in the District for purposes of 28 U.S.C. § 1391(b)(1), (c) and because both the Hawkins Property and the Ryder Property are in the Southern District of Ohio. 28 U.S.C. § 1391(b)(2).

### III.     COMMON FACTUAL ALLEGATIONS

40.     Plaintiff Hawkins and Plaintiff Ryder on behalf of themselves and all similarly situated persons, seeks to recover statutory damages, punitive damages, and actual damages

resulting from Defendant's wrongful conduct in connection with Plaintiffs' and class members' residential mortgage loans.

**A. Defendant services residential mortgage loans nationwide.**

41.     Defendant is one of the nation's largest providers of residential home mortgage loans. It services, and at all times relevant hereto has serviced, residential home mortgage loans nationwide.

42.     Defendant is a loan servicer and lender. It derives income in a number of ways including (a) payments based on a percentage of each borrower's principal balance pool, (b) float interest, (c) late fees, (d) foreclosure fees, (e) property inspection and preservation fees, and (f) broker opinion fees.

43.     Defendant is a wholly-owned and controlled subsidiary of Wells Fargo & Company (NYSE: WFC), one of the nation's largest financial institutions. Wells Fargo & Company is a Delaware corporation headquartered in San Francisco, California and a registered bank holding company.

44.     Wells Fargo & Company describes itself as a "diversified, community-based financial services company with $1.87 trillion in assets." *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id.* Wells Fargo & Company employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id.*

**B. Defendant employs uniform, nationwide loan servicing, loan modification, and foreclosure practices.**

45.     Defendant utilizes uniform and standardized loan servicing, loan modification, and foreclosure practices nationwide. Much of Defendant's uniform and standardized loan servicing, loan modification, and foreclosure practices are reliant upon automated processes, systems, and tools.

46.     Defendant's loan servicing, loan modification, and foreclosure practices are governed by federal requirements and obligations.

47.     The Fair Housing Agency ("FHA") is an agency within the United States Department of Housing and Urban Development ("HUD") that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

48.     Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default.

49.     Lenders must be pre-approved to qualify for FHA mortgage insurance. They must also comply with HUD regulations.

50.     Defendant is a pre-approved lender who qualifies for FHA mortgage insurance. Defendant is therefore required to comply with HUD regulations.

51.     For loans that are protected by FHA mortgage insurance, Defendant and the borrower(s) executed loan documents that incorporate by reference HUD regulations.

52.     In 2008, the federal government began the Troubled Asset Relief Program (TARP). Pursuant to TARP, all servicers that receive funding from TARP must participate in HAMP.

53.     Defendant received about $25 billion in TARP funds. In return, Defendant agreed to participate in HAMP and be obligated by all Program Documentation.

54.     In 2009, the Secretary of the Treasury implemented the FHA Home Affordable Modification Program ("HAMP"), which was designed to minimize foreclosures by incentivizing

loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

55.     All servicers of any loan guaranteed or owned by a GSE or government agency must comply with all HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury, GSEs, and federal agencies ("Program Documentation").

56.     Program Documentation obligations are voluntary for servicers of loans that are not guaranteed or owned by a GSE or government agency unless that servicer has executed a Service Participation Agreement. Stated otherwise, once a servicer elects to participate, all program standards become mandatory. HAMP incentivizes servicers to execute Service Participation Agreements.

57.     On April 13, 2009, Defendant entered into a Servicer Participation Agreement with the federal government. The Servicer Participation Agreement incorporates all Program Documentation and requires Defendant to comply with all Program Documentation with a high professional standard of care.

58.     In short, Defendant is required to comply with all Program Documentation, HAMP, and other Department of Treasury directives.

59.     Among other things, Defendant is required to review defaulted loans for modification eligibility prior to proceeding with any foreclosure. Defendant is required to offer to all defaulted borrowers modifications for which they are eligible prior to conducting any foreclosure. HAMP guidelines require the Defendant undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after

completing a formula-driven net present value analysis, the modified loan would be more profitable than the nonmodified loan, HAMP guidelines require Defendant offer a trial period plan modification. If the borrower completes the trial period plan, Defendant is required to permanently modify the loan.

60.     To request a modification, the Program Documentation requires each borrower submit standardized form assistance applications, financial worksheets, hardship affidavits, and acknowledgment and agreements (the "Modification Contract"). Pursuant to the standard form Modification Contract, the borrower makes a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are so requested. In return, Defendant agrees in the Modification Contract to examine the borrower's eligibility for all available modifications. If the borrower is eligible for any available mandatory modifications, Defendant is required by the Modification Contract (as well as HAMP and other Department of Treasury directives) to extend a trial period plan.

61.     These standardized Modification Contracts incorporate all applicable obligations in the Program Documentation.

62.     In all relevant communications with borrowers, Defendant represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under GSE guidelines and the HAMP.

63.     Defendant receives incentive payments for every successful modification under the Program Documentation. However, Defendant also benefits from unsuccessful modifications, along with foreclosures. If a federally-mandated modification is not required, Defendant can offer modification and temporary payment plans outside of HAMP, often under terms that are less

favorable to the borrower than federally-mandated plans. Further, Defendant can continue to obtain foreclosure, late fees, property inspection, preservation, and broker opinion fees. What is more, Defendant receives higher float interest payments for non-modification options such as a short sale or a foreclosure. It further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements.

**C. Defendant repeatedly fails to oversee, test, and audit its uniform loan servicing, mortgage modification, and foreclosure practices.**

64.     In 2010, the Office of Comptroller of the Currency ("OCC") discovered multiple deficiencies and unsafe and unsound practices in Defendant's residential mortgage servicing, modification, and foreclosure programs. The OCC determined that Defendant failed to oversee, audit, and test its foreclosure and modification tools and practices and failed to comply with applicable laws, prioritizing profits over compliance and causing substantial harm to consumers.

65.     The OCC's investigation and related investigations resulted in millions in fines assessed by the Federal Reserve to Wells Fargo & Company.

66.     As a result, Defendant agreed to two consent orders with the OCC, committing to taking all necessary and appropriate steps to remedy the deficiencies and unsafe and unsound practices identified by the OCC. In the consent orders, Defendant agreed to form compliance committees and programs subject to the oversight of the OCC. It agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance. Some such agreed processes were targeted at better oversight, auditing, and testing of automated tools, modification and foreclosure review, and fee assessments.

67.     But Defendant failed to remedy the deficiencies and unsafe and unsound practices identified by the OCC. It failed to adopt adequate oversight, auditing, and testing processes and

programs. And it failed to detect and/or correct repeated and systemwide servicing, modification, and foreclosure process errors.

68.     In 2015, OCC again determined that, despite the 2011 consent cease and desist orders, Defendant was continually failing to adequately oversee, audit, and test its servicing, modification, and foreclosure practices for compliance. As a result, the OCC assessed millions in monetary penalties against Defendant's parent company, Wells Fargo & Company.

69.     In early 2018, the OCC discovered additional and ongoing compliance and conduct failures in Defendant's loan servicing, modification, and foreclosure programs and processes. The OCC determined that Defendant's deficiencies and compliance failures constituted reckless and unsafe or unsound practices in violation of federal law and that Defendant failed to implement and maintain an adequate compliance risk management program. It found that Defendant failed to implement adequate oversight, control, auditing, and testing of its servicing, modification, and foreclosure programs and practices. The OCC also found that Defendant failed to adequately report compliance concerns, compliance failures, and Defendant's efforts to remedy them.

70.     As a result, Wells Fargo & Company and the Defendant entered into a consent cease and desist order with the OCC, again agreeing to adopt system-wide compliance programs and oversight.

71.     The Federal Reserve also issued a consent cease and desist order in early 2018 restricting Defendant's growth until governance, oversight, risk management, auditing, and testing is improved. In its consent cease and desist order, the Federal Reserve reports that it determined Defendant "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework

commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."

72.     As a result of the OCC's continued investigations and resulting consent orders, Defendant was and is on notice of serious errors, deficiencies, and unsafe and unsound practices in its loan servicing, modification, and foreclosure processes and practices from 2010 through the present. Defendant was and is likewise aware of the need for oversight, testing and auditing of those processes and practices, including the need for oversight, testing, and auditing of automated tools. Yet Defendant has habitually failed to adopt adequate oversight, testing, and auditing.

**D. Defendant's automated calculation errors.**

73.     Defendant's deficiencies, unsafe and unsound practices, and failure to conduct adequate oversight, auditing, and testing, resulted in a number of systemic automated calculation errors that greatly affected borrowers.

74.     From 2010 through 2019, Defendant utilized automated mortgage loan modification underwriting tools to determine what default borrowers are qualified for a mortgage loan modification or repayment plan.

75.     On information and belief, Defendant repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices. Defendant likewise failed to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws.

76.     As a result, Defendant's automated mortgage loan modification tool has been plagued with errors. Due to errors in the tool and related errors regarding the calculation of foreclosure attorneys' fees, Defendant wrongfully failed to approve hundreds of borrowers for mortgage loan modifications and/or repayment plans. Most of those borrowers, including Plaintiff

Hawkins and Plaintiff Ryder lost their homes. On information and belief, some of those borrowers were offered and accepted separate, less favorable temporary modification plans.

**E. Defendant's "first" automated calculation error.**

77.     As a result of its continuing failure to implement adequate oversight, auditing, and test controls, Defendant failed to timely identify a number of automated calculation errors in its mortgage software.

78.     As reported by the OCC, between March of 2013 and October of 2014, an unidentified error caused Defendant to fail to offer modifications to 184 borrowers who were entitled to modification trial period plans.

**F. Defendant's "second" automated calculation error.**

79.     Unbeknownst to the OCC, Defendant's "first" automated calculation error was not its only one.

80.     On August 3, 2018, Defendant's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (August 3, 2018) ("August Report"). In its report, Wells Fargo and Company revealed for the first time that it identified an automated calculation error that caused it to wrongfully deny loan modifications and resulted in hundreds of foreclosures of residential mortgage loans in default between April 13, 2010 and October 20, 2015:

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015, when the error was corrected. **This error in the modification tool caused an automated miscalculation of attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification** pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie mac) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect

attorneys' fees. **As a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification, a foreclosure was completed.**

(Emphasis Added).

81.    Defendant's August Report demonstrates that Defendant's loan modification underwriting tool utilized an automated calculation error for more than five years before it was corrected.

82.    During those five years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when in reality they were wrongfully prohibited from modifying their mortgage payments.

83.    During those five years, Defendant also wrongfully foreclosed on the homes of consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

84.    Also during those five years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

85.    Moreover, subsequent legal disclosures reveal that Defendant identified its "second" accounting error in August of 2013. Yet it continued to use the faulty software to assess borrowers' modification eligibility through October of 2015. [1] It was not until October 2, 2015 that

---

[1] Defendant's subsequent SEC filing certifies that the error was corrected on October 2, 2018, not October 20, 2018 as originally reported. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities

Defendant implemented new controls purporting to address the accounting error. And Defendant did not disclose this accounting error to government regulators, the public, or affected borrowers until almost three years later, on August 3, 2018. Despite detecting this error, Defendant concealed it from the public and the OCC, likely in an attempt to avoid additional fines and further OCC supervision.

86.     Even after discovering the calculation error, Defendant continued to conduct foreclosures on the homes of borrowers negatively affected by its "second" calculation error.

87.     Even after discovering the calculation error, Defendant continued to issue inaccurate periodic statements and notices to affected borrowers.

88.     In its August Report, Defendant committed to dedicating $8 million towards remediating customers who were affected by Defendant's "calculation error."

89.     On or around September of 2018, Defendant sent form letters to certain consumers affected by its "calculation error." In those letters, Defendant informed each consumer that, "[W]hen you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation and we're sorry. If it had been correct, you would have been approved for a trial modification." **Exhibit A** ("Apology Letter to Hawkins"); *see also* **Exhibit B** ("Apology Letter to Ryder").

90.     Although Defendant's letters state that it "*now* realize[s]" it has made an error causing it to wrongfully fail to approve the consumer's modification, Defendant's August Report demonstrates that it has known about the error since August of 2013.

91.     In its Apology Letter to Hawkins, Defendant encloses a payment "to help make up for [the borrower's] financial loss." *See Exhibit A.*  The enclosed payment is a check for about

---

Exchange Act of 1934 (Form 10-Q), p. 7, (November 6, 2018).

$13,000.00—an arbitrarily chosen modicum of the damages suffered by the borrower as a result of modification denial and resulting foreclosure. Neither the payment nor the Apology Letter is accompanied by a release. *See id.* Indeed, in its Apology Letter, Defendant encourages the borrower to cash the enclosed payment, and offers to attend additional mediation with the borrower (even if the borrower cashes the check) if the borrower does not believe the Defendant has "made things right."

92.     In its Apology Letter to Ryder, Defendant encloses a payment "to help make up for [the borrower's] financial loss." *See Exhibit B.*   The enclosed payment is a check for about $15,000.00—an arbitrarily chosen modicum of the damages suffered by the borrower as a result of modification denial and resulting foreclosure. Neither the payment nor the Apology Letter is accompanied by a release. *See id.* Indeed, in its Apology Letter, Defendant encourages the borrower to cash the enclosed payment, and offers to attend additional mediation with the borrower (even if the borrower cashes the check) if the borrower does not believe the Defendant has "made things right." '

93.     Defendant's Apology Letter to both Hawkins and Ryder also encloses a "Mediation Request Form" which states that the enclosed payment is available even if the consumer chooses to mediate. The Mediation Request Form also states that the consumer is "not waiving any legal claims by participating in the process."

94.     In its Apology Letter to both Hawkins and Ryder, Defendant also states that it is "also reaching out to the consumer reporting agencies to ask them to remove any negative reporting."

95.     In short, Defendant's Apology Letter to both Hawkins and Ryder admits that its accounting error caused consumers to be wrongfully denied a loan modification, admits that its

accounting error caused consumers harm, admits that its accounting error resulted in inaccurate negative reporting to consumer reporting agencies that should be corrected, and admits that Defendant had done nothing prior to September of 2018 to remediate consumers and remove negative and inaccurate credit reporting.

### G. Defendant's "third" automated errors.

96.     Despite being on notice of its automated calculation errors discovered in 2013 and 2014, Defendant still failed to implement adequate oversight, auditing, and testing compliance controls. That failure resulted in additional automated errors causing Defendant to wrongfully refuse to provide modifications on hundreds of additional borrowers' homes.

97.     On November 6, 2018, Defendant's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (November 6, 2018) ("November Report"). In its November Report, Wells Fargo and Company disclosed for the first time a third set of related calculation errors affecting an additional 245 consumers, which was identified using a "subsequent expanded review." The November Report also indicates that the first accounting error was actually corrected on October 2, 2015 (as opposed to October 20, 2015 as stated in the August Report):

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error regarding foreclosure attorneys' fees affecting certain accounts that were in the foreclosure process between April 3, 2010, and October 2, 2015, when the error was corrected. **A subsequent expanded review identified related errors regarding the maximum allowable foreclosure attorneys' fees permitted for certain accounts that were in the foreclosure process between March 15, 2010, and April 30, 2018, when new controls were implemented. Similar to the initial calculation error, these errors caused an overstatement of the attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises** (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA) and the U.S. Department of Treasury's Home Affordable

Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of these errors, taken together and subject to final validation, approximately 870 customers were incorrectly denied a loan modification or were not offered a loan modification or repayment plan in cases where they otherwise would have qualified. In approximately 545 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification or repayment plan, a foreclosure was completed.** The Company has contacted a substantial majority of the approximately 870 affected customers to provide remediation and the option also to pursue no-cost mediation with an independent mediator. Attempts to contact the remaining affected customers are ongoing. Also, the Company's review of these matters is ongoing, including a review of its mortgage loan modification tools.

(Emphasis added).

98.     The November Report demonstrates that Defendant's loan modification underwriting tool operated with errors related to the attorneys' fee calculation error for more than eight years.

99.     During those eight years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when in reality they were wrongfully prohibited from modifying their mortgage payments.

100.     During those eight years, Defendant also wrongfully foreclosed on the homes of consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

101.     Also during those eight years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

102.    The November Report also admits that Defendant was aware of the accounting error on or before April 30, 2018. But Defendant did not disclose this accounting error to the public or affected borrowers until almost six months later, on November 6, 2018.

103.    Despite knowing that its automated errors harmed consumers (and admitting in its Apology Letter that it was appropriate to request consumer reporting agencies remove any negative reporting), Defendant made no effort before November of 2018 to rescind the inaccurate and negative information reported to credit reporting agencies regarding consumers affected by the automated errors.

104.    In Exhibit 13 to its most recent Form 10-K Annual Report, Defendant disclosed that "[t]his effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

### IV.    PLAINTIFF HAWKINS' FACTUAL ALLEGATIONS

105.    Plaintiff Hawkins is just one victim of Defendant's common and repeated conduct. Her story is an example of the harm suffered by all members of the putative class as a result of Defendant's wrongful practices.

106.    On April 22, 2004, Plaintiff Hawkins took title to the Hawkins Property. Plaintiff Hawkins executed her first mortgage with Oak Street Mortgage in December of 2004.

107.    Plaintiff Hawkins refinanced her original mortgage in 2005 into a 7.75% fixed-interest thirty-year mortgage, with the first monthly payment due on February 1, 2005. Defendant was the servicer of Plaintiff Hawkins' refinanced mortgage.

108.    Plaintiff Hawkins' loan documents incorporate by reference the HAMP regulations.

109.    In the mid-2000s, Plaintiff Hawkins (along with many consumers nationwide) fell upon hard times. In May of 2006, Plaintiff Hawkins missed her first mortgage payment, defaulting on her loan pursuant to the provisions in her standard-form mortgage.

110. Defendant reported Plaintiff Hawkins' default to credit reporting agencies. On September 22, 2006 Defendant and the owner of Plaintiff Hawkins Loan commenced a foreclosure case in Franklin County (OH) Court of Common Pleas Case No. 06 CV 014201 captioned *U.S. Bank, National Association, et al. v. Diane Jaynes, et al.* (the "Hawkins Foreclosure")

111. Plaintiff Hawkins continued making mortgage payments intermittently when she was able.

112. On April 27, 2007, Plaintiff Hawkins made her last payment.

113. Defendant continued to report Plaintiff Hawkins' default to credit reporting agencies.

114. Plaintiff Hawkins sought mortgage assistance from Defendant throughout her default. In 2010, she executed and submitted a form Modification Contract. On May 12, 2010, Plaintiff Hawkins' mortgage entered loss mitigation review. On August 2, 2010, as a result of Defendant's automated calculation errors, Defendant erroneously determined that Plaintiff Hawkins was not qualified for a mortgage loan modification or temporary payment plan pursuant to the requirements of government-sponsored enterprises, the FHA, or HAMP. On September 9, 2010, Defendant wrongfully denied Plaintiff Hawkins mortgage assistance due to an inflated post-modification debt to income ratio.

115. Plaintiff Hawkins complied with all obligations under the Modification Contract. Indeed, Defendant admits that, but for its accounting error, her modification request would have been granted.

116. Defendant continued to review Plaintiff Hawkins' loan for mortgage assistance. But Plaintiff Hawkins's modification was repeatedly denied.

117. Defendant never modified Plaintiff Hawkins' loan. Defendant moved forward with the Sheriff's Sale of Hawkins's home on June 12, 2015 and the sale was confirmed in the Hawkins Foreclosure on July 20, 2015. Plaintiff Hawkins lost her home because of Defendant's calculation errors.

118. As a result of Defendant's failure to modify Plaintiff Hawkins' loan and the loss of her home, Plaintiff Hawkins was forced to pay moving expenses and rent payments.

119. Also as a result of Defendant's failure to modify Plaintiff Hawkins' loan and the loss of her home, Plaintiff Hawkins suffered significant mental anguish which affected her personal and professional relationships.

120. More than eight years later, Defendant sent Plaintiff Hawkins a form Apology Letter dated September 14, 2018. **Exhibit A.** The form Apology Letter inaccurately states that Defendant has just now realized that it committed an error and that Plaintiff Hawkins should have been approved for a trial modification. *Id.* The form Apology Letter acknowledges that Defendant's error affected Plaintiff Hawkins at a time when she was facing a hardship. *Id.* It admits that Defendant is obligated to "make things right."

121. This was the first time Plaintiff Hawkins learned that Defendant had committed an accounting error and that her modification request should have been approved. Never in the years since her foreclosure did Defendant attempt to discuss with Plaintiff Hawkins its accounting error or its wrongful failure to provide mortgage assistance.

122. Along with the Apology Letter, Defendant enclosed a check for about $13,000. Plaintiff Hawkins does not believe this payment is anywhere close to enough to compensate her for the harm she suffered as a result of Defendant's wrongful practices. Thus, as instructed in the Apology Letter, Plaintiff Hawkins requested mediation via a signed Mediation Request Form dated

September 26, 2018. Defendant responded in November of 2018 refusing any additional payment and stating that Plaintiff Hawkins had not suffered any harm as a result of its calculation error.

123.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Hawkins was entitled), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of her home caused Plaintiff Hawkins significant stress and anxiety. Plaintiff Hawkins' personal relationships and credit suffered as a result of Defendant's refusal to modify her loan, Defendant's reports to consumer reporting agencies, and the ultimate foreclosure. She suffered opportunity costs and lost her home, as well as the equity, appreciation, and associated tax benefits. She wrongfully lost the opportunity to receive HAMP incentive payments. And other methods of curing her default (including refinancing options) were affected by negative credit reporting. She also suffered moving and housing costs. The exact monetary value of damages suffered by Plaintiff Hawkins as a result of its wrongful practices are unknown at this time.

## V.    PLAINTIFF ETHAN RYDER'S FACTUAL ALLEGATIONS

124.    Plaintiff Ryder is yet another victim of Defendant's common and repeated conduct. His story is an example of the harm suffered by all members of the putative class as a result of Defendant's wrongful practices.

125.    On March 27, 2009 Plaintiff Ryder took title to the Ryder Property. Plaintiff Ryder also concurrently executed his first (both in priority and first for him) mortgage with Union National Mortgage Company for the Ryder Property in the amount of $137,700.00.

126.    In the fall of 2011 Plaintiff Ryder contacted Defendant in anticipation of proposed default due to a recent employment issue. These initial conversations resulted in Defendant designating a home loan preservation specialist as early as December 1, 2011.

127.    Between December 1, 2011 and February 2, 2012 Plaintiff Ryder submitted a facially complete application for loss mitigation as well as a short sale application to be reviewed by Defendant pursuant to HAMP as well as the Freddie Mac guidelines who Defendant indicated was the investor of Plaintiff Ryder's Mortgage Loan.

128.    On February 2, 2012 Defendant issued written correspondence to Plaintiff Ryder notifying him that he did not qualify for a HAMP Modification. Based upon receipt of Exhibit B Plaintiff Ryder now reasonably believes this application was denied due to the errors in the HPA Tool which caused Defendant to artificially inflate the principal balance owed on the loan, resulting in an improper denial based on Plaintiff Ryder's wrongfully calculated debt-to-income ratio.

129.    In the same letter, Defendant invited Plaintiff Ryder to apply for a short sale.

130.    On or about April 22, 2012 Plaintiff Ryder submitted a second application for loss mitigation directly to his designated Home Preservation Specialist at Defendant, "Mozella Harris". This application was supplemented on May 22, 2012.

131.    Between May 22, 2012 and June 17, 2012 Defendant reviewed the second application as facially complete. On June 18, 2012 Defendant generated a letter to Plaintiff Ryder notifying him that his second application was denied because his investor, who Defendant did not identify in this letter, declined the request to modify his mortgage.

132.    In the same letter Defendant again invited Plaintiff Ryder to sell his home, engage in a short sale, or deed his property to Defendant.

133.    On or about June 22, 2012 Plaintiff Ryder received a letter from Defendant dated June 20, 2012 indicating his loan was returning to collections.

134.     Between June 22, 2012 through October 12, 2012, Defendant sent Plaintiff Ryder three additional solicitations for short sale.

135.     On November 22, 2012 Plaintiff Ryder sent Defendant paperwork for consideration for a short sale which included a proposed Listing Agreement and offer on the home for $120,000.00.

136.     Much to his surprise about a week later Plaintiff Ryder received correspondence from Defendant dated November 27, 2012 which notified him that Defendant would be reviewing him for mortgage assistance, including loan modification, and if he did not qualify for a loan modification, Defendant would review for "other options".

137.     On or about January 24, 2013 Defendant notified Plaintiff Ryder his short sale application had been denied.

138.     Following this denial Plaintiff Ryder engaged an attorney to assist him with attempting a deed-in-lieu of foreclosure as the loan was still delinquent but Defendant had not initiated foreclosure at that point.

139.     On or about February 18, 2013 Plaintiff Ryder submitted a new short sale packet to Defendant.

140.     Over the next five-and-a-half months Plaintiff Ryder, his counsel, and Defendant worked to complete the short sale process.  On August 12, 2013 Plaintiff Ryder sold the property for $130,000.00.

141.     Due to the increased sale price, the loss to Defendant was *de minimis* and Defendant chose not to pursue Ryder for the deficiency despite Plaintiff Ryder's mortgage not being completely satisfied with the remittance of the $130,000.00.

142.    As a result of Defendant's failure to modify Plaintiff Ryder's loan and the loss of his home, Plaintiff Ryder relocated to Warren County, Ohio from an up-and-coming neighborhood in Hamilton County, Ohio and was forced to pay moving expenses and rent payments which since August 2013 have been greater than his mortgage payment.

143.    Also as a result of Defendant's failure to modify Plaintiff Ryder's loan and the loss of his home, Plaintiff Ryder lost the opportunity to lose out on the $116,630.00 in equity that has accrued in the Ryder Property based on tax valuation since the sale of the home.

144.    Also as a result of Defendant's failure to modify Plaintiff Ryder's loan and the loss of his home, Plaintiff Ryder suffered significant mental anguish which affected his personal and professional relationships.

145.    More than eight years later, Defendant sent Plaintiff Ryder a form Apology Letter dated September 12, 2018. **Exhibit B.** The form Apology Letter inaccurately states that Defendant has just now realized that it committed an error and that Plaintiff Ryder should have been approved for a trial modification. *Id.* The form Apology Letter acknowledges that Defendant's error affected Plaintiff Ryder at a time when she was facing a hardship. *Id.* It admits that Defendant is obligated to "make things right."

146.    This was the first time Plaintiff Ryder learned that Defendant had committed an accounting error and that her modification request should have been approved. Never in the years since being forced to sell the Ryder Home did Defendant attempt to discuss with Plaintiff Ryder its accounting error or its wrongful failure to provide mortgage assistance.

147.    Along with the Apology Letter, Defendant enclosed a check for $15,000.00 Plaintiff Ryder does not believe this payment is anywhere close to enough to compensate him for the harm he suffered as a result of Defendant's wrongful practices. Rather than pursue the

mediation form, Plaintiff Ryder engaged Plaintiffs' Counsel DannLaw to file a Complaint for Discovery (as well as an Amended Complaint) pursuant to Ohio Civ. R. 27(A)(1) and Ohio Civ. R. 34(D) in Warren County Court of Common Pleas Case No. 18-MS-281 captioned *Ethan Ryder v. Wells Fargo Bank N.A.* (the "Discovery Complaint").

148.    The Discovery Complaint was resolved by an Agreed Order entered between Plaintiff Ryder and Defendant on May 22, 2019.

149.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Ryder was eligible), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home caused Plaintiff Ryder significant stress and anxiety. Plaintiff Ryder's personal relationships and credit suffered as a result of Defendant's refusal to modify his loan, Defendant's reports to consumer reporting agencies, and the sale of his home. He suffered opportunity costs and lost his home, as well as the equity, appreciation, and associated tax benefits and other methods of curing his default (including refinancing options) were affected by negative credit reporting. He also suffered moving and housing costs. The value of damages suffered by Plaintiff Ryder as a result of its wrongful practices are unknown at this time.

### V.PROPRIETY OF CLASS ACTION PROSECUTION

**A.  Proposed Class Definition**

150.    The members of the Proposed Class include all individuals:

   a.   who were a mortgagee to any residential home mortgage loan owned and/or serviced by Defendant on or after March 15, 2010,

   b.   which loan entered loss mitigation review and/or was the subject of any borrower or mortgage assistance application submitted on or after March 15, 2010,

    c.  which loan qualified for a mortgage loan modification, repayment plan, or a trial period plan pursuant to the requirements of government-sponsored entities, the FHA, and HAMP,

    d.  but which loss mitigation review and/or borrower or mortgage assistance application was denied by Defendant,

    e.  as a result of automated calculation and related errors pertaining to Defendant's use of a mortgage loan modification underwriting tool.

### B. Fed. R. Civ. P. 23(a)(1): Numerosity

151. Based upon Defendant's statements made through Counsel in *Hernandez v. Wells Fargo Bank, N.A.*, United States District Court Case No. 3:18-cv-07354-WHA along with statements made by Wells Fargo & Company in the November Report, at least 870 individuals were unlawfully denied home loan modifications as a result of the accounting errors at issue in this case. Of those 870 individuals, at least 55 reside in Ohio and are members of this Proposed Class. *See Exhibit C* – Email of Kobi Brinson, January 14, 2019 (discussing breakdown of affected borrowers by State by percentage as of January 14, 2019). Thus, the Class is so numerous that joinder of all members in impracticable. Class members can easily be identified through Defendant's records, or by other means.

### C. Fed. R. Civ. P. 23(a)(2) and (b)(3): Commonality and Predominance.

152. There are common questions of law and fact subject to answers common to all Proposed Class members that predominate over any questions affecting only individual members, including but not limited to:

    a.  What calculation and related errors occurred in Defendant's mortgage loan modification underwriting tool and/or related software between 2010 and 2018?

b. What were Defendant's common policies and practices regarding its oversight, inspection, auditing, testing, review, repair, and control of automated loan modification tools and related software between 2010 and 2018?

c. What were Defendant's common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies between 2010 and 2018?

d. What were Defendant's common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies between 2010 and 2018?

e. How and when did Defendant discover errors in its automated loan modification tools and related software?

f. What actions and/or disclosures did Defendant take and/or make each time it discovered errors in its automated loan modification tools and related software?

g. When was Defendant on notice of the risk of errors in its automated loan modification tools due to inadequate oversight, auditing, and testing compliance mechanisms?

h. Did Defendant undertake any effort to correct its erroneous reporting to credit reporting agencies prior to September of 2018?

i. Did Defendant owe contractual obligations to Proposed Class members by failing to approve them for loan modifications or repayment plans for which they were qualified pursuant to pursuant to the requirements of government sponsored enterprises, the FHA, and HAMP?

j. Did Defendant breach those contractual obligations?

k.  Was Defendant's conduct extreme and outrageous?

l.  Did Defendant intentionally, with substantial certainty, or with reckless indifference cause serious emotional harm to members of the Proposed Class?

m.  Did Defendant conceal or misrepresent to members of the Proposed Class its automated calculation errors and/or their entitlement to loan modifications?

n.  Was any such concealment or misrepresentation material to members of the Proposed Class' loan modification?

o.  Did Defendant conceal or misrepresent material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity?

p.  Did defendant conceal or misrepresent material facts with the intent of provoking justified reliance from members of the Proposed Class?

**D.  Fed. R. Civ. P. 23(a)(3): Typicality.**

153.  The claims of the Plaintiffs are typical of the claims of the class:

a.  Plaintiffs were subject to a mortgagee of a residential home mortgage loan that was owned and/or serviced by Defendant on or after March 15, 2010.

b.  Plaintiffs submitted mortgage assistance applications and their loan entered loss mitigation review on or after March 15, 2010.

c.  Plaintiffs qualified for mortgage loan modification trial period plans pursuant to HAMP.

d.  But Plaintiffs' requests for modification and the loss mitigation review were denied by Defendant.

e.  And that denial was a result of automated calculation and related errors pertaining to Defendant's use of mortgage loan modification and underwriting tool. Had

Defendant not based its decision on a faulty calculation, Plaintiffs would have been approved for trial modifications.

f.  As such, Plaintiffs are members of the Proposed Class.

154.  Defendant's actions and inactions described above violated Plaintiffs' and the Proposed Class' statutory and common law rights.

155.  Plaintiffs and all members of the Proposed Class have suffered damages as a result of Defendant's actions and inactions described above.

156.  Furthermore, Defendant's defenses to Plaintiffs' claims and the claims of members of the Proposed Class will be largely identical for a number of reasons, including (1) Defendant's failure to approve Plaintiffs and the Proposed Class for temporary trial modification plans were the result of the same accounting and related errors, affecting the same calculation of attorneys' fees, effectuated using the same mortgage loan modification underwriting tool; (2) Defendant admits that, had it not based its modification decision regarding Plaintiffs and members of the Proposed Class on a "faulty calculation" Plaintiffs and all members of the Proposed Class would have received trial modifications; (3) Defendant utilized common and uniform policies, forms, and procedures when considering Plaintiffs' and all Proposed Class members' loans for modification; and (4) Plaintiffs' claims are predicated on duties and actions identical to Defendant's duties and actions owed and taken in regard to all Proposed Class members' residential real property loans.

**E.  Fed. R. Civ. P. 23(a)(4): Adequacy of Representation.**

157.  Plaintiffs will fairly and adequately protect the interests of the class.

158.  Plaintiffs come before this Court as victims of Defendant. They were the mortgagees of loans that were in default and serviced by Defendant. They were qualified for mortgage loan modification or repayment plans. But due to Defendant's calculation and other

automated errors, they were wrongfully denied modification. Ultimately, Plaintiff Hawkins lost her home in foreclosure. Ultimately Plaintiff Ryder was compelled to a short sale of his home which denied him the ability to enjoy the $136,630.00 in equity that has accrued since Ryder was forced to sell his home due to the wrongfully denied modification.

159.    Plaintiffs come in the same capacity as any other litigant seeking redress for grievances and class relief for the harm which they and members of the Proposed Class suffered.

160.    Plaintiffs have no interest that is antagonistic to those of the Proposed Class and are ready and willing to bring this class action in a representative capacity on behalf of the Proposed Class.

161.    Plaintiffs' counsel will fairly and adequately prosecute the case on behalf of Plaintiffs and the Proposed Class.

162.    Attorneys Jeffers, Danielson, Sonn & Aylward, P.S. and the DannLaw are experienced trial attorneys who have engaged in extensive trial practice and have considerable experience in all aspects of class and mass tort litigation from several other class action and mass tort cases, including class action and mass tort cases against lenders and loan servicers.

163.    Attorneys Jeffers, Danielson, Sonn & Aylward, P.S. and DannLaw have the necessary skills, expertise, and competency to adequately represent Plaintiffs' interests and those of the class.

## VI.   TOLLING ALLEGATIONS FOR ALL CLAIMS
### TOLLING ALLEGATIONS FOR ALL COUNTS

164.    The causes of actions alleged herein by the Plaintiffs against Defendant did not accrue or were tolled until the Plaintiffs discovered, or could have discovered with exercise of reasonable diligence, the facts giving rise to their legal claims. Based upon the allegations

contained herein and Exhibits A and B the earlier either Plaintiff Hawkins and/or Plaintiff Ryder could have learned of their claims was September 13, 2018.

165.    Based upon the allegations contained herein the Plaintiffs had no realistic possibility until receiving the Hawkins Letter and the Ryder Letter, respectively, to know that (a) either of them qualified for a loan modification and (b) they were denied wrongfully for a mortgage modification based on a miscalculation done by Defendant's automated decision-making tool that was exclusively under the control of Defendant at all times (as it remains).

166.    Based upon the allegations contained herein the Plaintiffs had no realistic ability to discover any facts only known to Defendant regarding the wrongful denial for the mortgage modifications submitted between 2010 and 2015.  Defendant's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for any mortgage modification depend solely on variables within Defendant's exclusive control or information provided exclusively to Defendant.

167.    Based on all of the foregoing, any applicable statutes of limitations are also tolled by Defendant's knowing, active, and ongoing concealment of the facts alleged herein. Defendant discovered at least one, if not multiple, software errors back in August 2013 which contributed to the wrongful denial of loans modifications of the Plaintiffs or any borrower similarly situated. Based on the allegations contained herein, Exhibit A, Exhibit B, and each 10-Q issued by Wells Fargo & Company since August 2018, Defendant deliberately concealed any information regarding the wrongful denial until September 13, 2018.  Defendant has a continuous duty to disclose the truth to the Plaintiffs and based upon the actions herein the Plaintiffs reasonably relied on Defendant's on-going concealment until taking the actions to procure discovery described herein.

## VII. CAUSES OF ACTION

## COUNT ONE: BREACH OF CONTRACT

168.     Plaintiffs and each member of the Proposed Class entered into a contract with Defendant. The terms of the contract are set forth in the uniform borrower assistance form (the "Form Contract"). The Form Contract is a standard form document containing identical provisions as required by GSEs, HUD, and the HAMP.

169.     The Form Contract required Plaintiffs and each member of the Proposed Class to (among other things) certify under penalty of perjury that the information provided is truthful, provide authority to investigate their financial status, and agree to credit counseling.

170.     In consideration, Defendant agreed via the Form Contract to evaluate Plaintiffs and each member of the Proposed Class for temporary payment plan or modification program in compliance with the GSE, HUD, and HAMP requirements. Defendant agreed via the Form Contract to offer Plaintiffs and each member of the Proposed Class the best temporary payment plan or modification program for which they were eligible.

171.     The Form Contract governs the relationship between Plaintiffs and members of the Proposed Class and Defendant with regard to temporary payment plan and modification programs pursuant to GSE, HUD, and HAMP requirements and incorporates by reference those GSE, HUD, and HAMP requirements. The Form Contract is signed by Plaintiffs and each member of the Proposed Class.

172.     Plaintiffs and each member of the proposed class provided documents, information, and certifications in compliance with the Form Contract.

173.     As a result, Defendant considered Plaintiffs and each member of the Proposed Class for a loan modification. Plaintiffs and each member of the proposed class were eligible for a GSE, HUD, or HAMP temporary payment plan or loan modifications. But Defendant did not offer

Plaintiffs or each member of the Proposed Class any temporary payment plan or loan modification. Defendant failed to do so because of a faulty automated calculation. Had that automated calculation been correct, Plaintiffs and each member of the Proposed Class would have been approved for a trial modification. Defendant breached its obligations to Plaintiffs and each member of the Proposed Class under the Form Contract.

174.    Defendant's breach impacted Plaintiffs and members of the Proposed Class at a time when they were experiencing extreme hardship. As a result of the faulty automated calculation, Defendant incorrectly provided negative credit information to consumer reporting agencies. Plaintiffs and members of the Proposed Class were not offered trial modifications and/or were offered less beneficial modification plans. Ultimately, Plaintiffs and most members of the Proposed Class lost their homes as a result of Defendant's contract breach.

175.    In addition to the express and incorporated terms of the Form Contract, the law implies a duty of good faith and fair dealing to which Defendant owed to Plaintiffs and members of the Proposed Class.

176.    Defendant discovered its "first" automated calculation error on or before October 2, 2015. While Defendant states that it fixed the first automated calculation error on October 2, 2015, it failed to disclose the error to the public until August 3, 2018 and failed to disclose the error to individuals it affected until September of 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Proposed Class to suffer significant harm, Defendant did nothing for almost three years to mitigate the harm it caused to Plaintiffs and members of the Proposed Class, keeping the accounting error a secret. On information and belief, Defendant continued to foreclose on the homes of Plaintiffs and members of the Proposed Class and failed to offer modification plans to Plaintiffs and members of the Proposed Class after discovering its

automated calculation error. Defendant breached the duty of good faith and fair dealing it owed to Plaintiffs and members of the Proposed Class.

177.    Defendant discovered its "second" automated calculation error on or before April 30, 2018. While Defendant states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to the public until November 6, 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Proposed Class to suffer significant harm, Defendant has done nothing to mitigate the harm it caused to Plaintiffs and members of the Proposed Class. Defendant breached the duty of good faith and fair dealing it owed to Plaintiffs and members of the Proposed Class.

178.    Defendant also breached the duty of good faith and fair dealing it owed to Plaintiffs and members of the Proposed Class by failing to maintain adequate procedures in support of its automated modification eligibility review programs.

179.    Plaintiffs and members of the Proposed Class were injured by Defendant's breach of the Form Contract and suffered damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION: FRAUDULENT CONCEALMENT

180.    Defendant misrepresented to Plaintiffs and members of the Proposed Class their eligibility for modification options. Moreover, Defendant actively and knowingly concealed for years its automated calculation errors. On information and belief, despite discovering those errors, Defendant continued to conduct foreclosures and issue notices of default regarding properties and consumers affected by those errors.

181.    Plaintiffs' and members of the Proposed Class' modification eligibility was of the utmost importance to Plaintiffs and members of the Proposed Class. Their eligibility for modification—as well as the automated errors erroneously determining them to be ineligible for

modification—were material to Plaintiffs and members of the Proposed Class.

182. Defendant knew or should have known about its automated calculation errors and, therefore, Plaintiffs' and members of the Proposed Class' eligibility for modifications. Defendant either knew about its automated calculation errors and actively concealed them, as well as their effects. Or Defendant should have known of the errors, but acted with utter disregard and recklessness. Defendant was on notice since as early as 2010 of seriously deficient, unsafe, and unsound practices in its loan servicing, modification, and foreclosure programs. Despite committing in multiple consent cease and desist orders to do so, Defendant failed to adopt adequate controls, including necessary oversight, auditing, and testing procedures. In short, despite repeated reminders of its erroneous servicing, modification, and foreclosure practices and tools, Defendant elected to put profits and growth over compliance.

183. By wrongfully communicating to Plaintiffs and members of the Proposed Class their purported ineligibility for loan modifications and by actively concealing from them, the public, and government regulators known calculation tool errors and compliance deficiencies, Defendant intended to provoke reliance of Plaintiffs and members of the Proposed Class on Defendant's misrepresentations and omissions.

184. Plaintiffs and members of the Proposed Class relied upon Defendant's misrepresentations and omissions. That reliance was justified, particularly given that Defendant had in its power all of the tools necessary to determine eligibility for mortgage modification. Plaintiffs and members of the Proposed Class had neither the sophistication nor tools to check Defendant's misrepresentations and omissions regarding their mortgage modification eligibility and calculations.

185. Defendant's conduct proximately caused Plaintiffs' and members of the Proposed

Class' injuries, resulting in damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

186.   As alleged in this complaint, Defendant engaged in extreme and outrageous conduct. It repeatedly failed to oversee, audit, and test its servicing, modification, and foreclosure practices, including its automated calculation software. It then used that automated calculation software to make automated decisions about offering modifications and whether or not its customers could keep their family homes. As a result of repeated federal investigations, fines, and consent cease and desist orders, Defendant was on notice of its own deficient, unsafe, and unsound practices. Yet it allowed material errors in its software to persist for years, affecting hundreds of borrowers and causing the unnecessary foreclosure of hundreds of homes.

187.   And despite discovering its 2010-2015 automated calculation error no later than 2015, Defendant concealed its errors from government regulators and the public until 2018, when it was subjected to yet another consent cease and desist order. As the Federal Reserve determined, Defendant prioritized profits and growth over compliance.

188.   Defendant's conduct was intentional and evidences a callous and reckless disregard for the rights of its customers and for the risk its actions posed to its customers.

189.   Defendant's intentional extreme and outrageous conduct proximately caused Plaintiffs' and members of the Proposed Class' emotional distress and damages, in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Diane Hawkins and Ethan Ryder on behalf of themselves and others similarly situated demands judgment against Defendant Wells Fargo Bank, N.A. as follows:

1.     For entry of judgment in favor of Plaintiffs and members of the Proposed Class against Defendant for damages in an amount to be proven at trial, including treble and/or punitive damages in accordance with applicable law.

2.     For entry of judgment in favor of Plaintiffs and members of the Proposed Class against Defendant for reasonable attorneys' fees and costs.

3.     For entry of judgment in favor of Plaintiffs and members of the Proposed Class for pre-judgment interest on all damages.

4.     For such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs Diane Hawkins and Ethan Ryder, individually and on behalf of all persons similarly situated, demand a trial by jury on all counts so triable.


Respectfully Submitted,

By:   /s/ Marc E. Dann
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
**DannLaw**
P.O. Box. 6031040
Cleveland, Ohio 44103
Office:  (216) 373-0539
Facsimile: (216) 373-0536
notices@dannlaw.com

Clay M. Gatens, WSBA No. 34102
Devon A. Gray, WSBA No. 51485
JEFFERS, DANIELSON, SONN & AYLWARD, P.S.
2600 Chester Kimm Road
P.O. Box 1688
Wenatchee, WA 98807-1688
Telephone: 509-662-3685
Fax: 509-662-2452
Email: ClayG@jdsalaw.com

Email: DevonG@jdsalaw.com
*Pro Hac Vice Applications to be submitted*

*Counsel for Plaintiffs and Potential Class*