## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DISTRICT

| | |
|---|---|
| **ETHAN RYDER**, *et al.*,<br>*on behalf of themselves and all others*<br>*similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>**WELLS FARGO BANK, N.A.**<br><br>Defendant. | Case No.1:19-CV-638<br><br>Judge Timothy S. Black<br><br>Magistrate Judge Karen L. Litkovitz<br><br>**THIRD AMENDED CLASS**<br>**ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Ethan Ryder, James Chambers, Maureen Mann, Viola Thomas, Kimberly Duncan, Jose Aguilar and Elizabeth Manley on behalf of all of those similarly situated, and for their Third Amended Complaint for Damages against Defendant Wells Fargo Bank, N.A. state as follows:

### I.    NATURE OF THE CASE

1.    This case seeks recourse for the hundreds of borrowers who suffered damages as a result of Wells Fargo Bank, N.A.'s ("Defendant's") "calculation errors," which stemmed from a common cause, and resulted in Defendant wrongfully denying trial loan modifications to over a thousand consumers.

2. Defendant is one of the largest financial institutions in America and one of the nation's largest residential home mortgage servicers. Among other things, Defendant provides mortgage loan modification services to consumers who have defaulted on their mortgage.

3. Defendant uses mortgage loan modification tools to create automated calculations and to determine whether consumers in default are eligible for loan modifications under Government Sponsored Enterprise ("GSE") and other federal agency requirements.

4. Between 2010 and 2018, Defendant failed to detect or ignored multiple systematic errors in its automated decision-making software. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet, Defendant failed to adequately test, audit, and verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification. Defendant further failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years.

5. As a result of Defendant's deficient auditing and compliance procedures, Defendant repeatedly violated the Home Affordable Modification Program ("HAMP") and other government statutes, regulations, and enforcement orders over a period of at least eight years. By this conduct, Defendant denied Plaintiffs and other Class members mortgage modifications that Defendant was legally required to offer.

6. To make matters worse, even after discovering the 2013 error, Defendant continued using the faulty mortgage modification software to assess borrowers' eligibility for modification options for more than two years. Defendant did not implement new controls until

October of 2015. And, it did not disclose the error to federal regulators or the public until August of 2018.

7.   Moreover, despite discovering the error in 2013 and allegedly implementing new controls in 2015, Defendant still did not reform its auditing and verification practices. Related errors that would affect hundreds of additional borrowers were not discovered, remedied, or disclosed until 2018.

8.   Defendant's failure to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Defendant and its parent company intentionally abandoned their oversight responsibilities—and did so to a shocking degree. And, until they were caught red handed, they concealed those failures.

9.   Defendant's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced through a formal Cease and Desist Letter that it would prohibit Defendant's parent company from expanding its business until it sufficiently improved its governance and controls.

10.   Finally, during his testimony on March 12, 2019 in the United States House of Representatives Financial Services Committee, former Wells Fargo CEO Timothy Sloan admitted the fundamental allegations of this Complaint: that due to the Bank's actions or inactions, hundreds (later revealed to be thousands), of customers were improperly denied a loan modification between 2010 and 2015, and that over 500 of those had lost their homes to

foreclosure. And he also admitted that Wells Fargo did not disclose to those victims that they had been injured through no fault of their own until late 2018.

11.     The subsequent identification of additional affected borrowers whose trial mortgage modifications were denied because of Wells Fargo's errors, but who were not foreclosed upon by Wells Fargo, brings the total number of Class members to approximately 1,830.

## II.     PARTIES

12.     <u>Representative Plaintiff Ethan Ryder</u>. ETHAN RYDER is a natural person and citizen of Ohio residing in Warren County, Ohio ("Plaintiff Ryder"). Plaintiff Ryder owned certain real property located at 521 Tusculum Avenue, Cincinnati, Ohio 45226 (the "Ryder Property") from March 27, 2009 until on or about August 12, 2013, when due to the admittedly erroneous actions of Wells Fargo, he lost the property.

13.     <u>Representative Plaintiff James L. Chambers Jr</u>. JAMES L. CHAMBERS, JR. is a natural person and a citizen and resident of New Jersey ("Plaintiff Chambers"). Plaintiff Chambers owned certain real property located at 262 Leffler Circle, Florence, New Jersey 08518 (the "Chambers Property") from 2007 until August 2018 when he lost it due to Wells Fargo's admittedly erroneous actions.

14.     <u>Representative Plaintiff Viola Thomas</u>. VIOLA THOMAS is a natural person and citizen of Delaware residing in New Castle County, Delaware ("Plaintiff Thomas"). Plaintiff Thomas owned certain real property located at 124 Donhaven Drive, New Castle, Delaware 19720 (the "Thomas Property") from May 3, 1999 until on or about February 3, 2012 when she lost it due to Wells Fargo's admittedly erroneous actions.

15.    <u>Representative Plaintiff Maureen Mann</u>. MAUREEN MANN is a natural person and citizen and resident of Colorado residing in Boulder County, Colorado ("Plaintiff Mann"). Plaintiff Mann owned certain real property located at 4059 38th Avenue Southwest, Seattle, Washington 98126 (the "Mann Property") from July 2007 until on or about May 2014 when she lost it due to Wells Fargo's admittedly erroneous actions.

16.    <u>Representative Plaintiff Kimberly Duncan</u>. KIMBERLY DUNCAN is a natural person and citizen of New Jersey residing in Middlesex County, New Jersey ("Plaintiff Duncan"). Plaintiff Duncan owned certain real property located at 337 Cedar Street, South Amboy, New Jersey 00879 (the "Duncan Property") from April 22, 2011 until February 25, 2014 when Duncan sold the property in direct response to Wells Fargo's admittedly erroneous actions.

17.    <u>Representative Plaintiffs Jose Aguilar and Elizabeth Manley</u>. JOSE AGUILAR is a natural person and citizen and resident of New York residing in Madison County, New York ("Plaintiff Aguilar"). ELIZABETH MANLEY is a natural person and citizen and resident of Pinellas County, Florida ("Plaintiff Manley"). Aguilar and Manley were the owners of certain real property, located at and commonly known as 203 Edwin Street, Chittenago, New York 13037 (the "Aguilar/Manley Property") which they occupied as their primary, principal residence until it was sold at Sheriff's sale on November 30, 2015 due to Wells Fargo's admittedly erroneous actions.

18.    <u>Defendant Wells Fargo Bank, N.A</u>. WELLS FARGO BANK, NATIONAL ASSOCIATION is a federally-chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in Sioux Falls, South Dakota ("Defendant"). Defendant is subject to the supervision of the Comptroller of the

Currency of the United States Department of the Treasury and is deemed a citizen of South Dakota pursuant to 28 U.S.C. § 1348.

19. Defendant executed contracts across the United States and in the State of Ohio, including the loans at issue with the Ryder Property in Hamilton County Ohio. Defendant regularly engages and transacts substantial business across the State of Ohio.

20. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because at least one member of the Class is a citizen of a state different from Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5 million exclusive of interests and costs.

21. This Court has personal jurisdiction over Defendant. In addition to the substantial business Defendant conducts in Ohio, Plaintiff Ryder's contract with Defendant was executed in the Southern District of Ohio, Western Division regarding real property located in the Southern District of Ohio, Western Division.

22. This district is the proper venue for this action as Defendant resides in the District for purposes of 28 U.S.C. § 1391(b)(1) or (c) and because the Ryder Property is in the Southern District of Ohio for purposes of 28 U.S.C. § 1391(b)(2).

### III. COMMON FACTUAL ALLEGATIONS

23. Plaintiffs, on behalf of themselves and all similarly situated persons, seek to recover statutory damages, punitive damages, and actual damages resulting from Defendant's wrongful conduct in connection with Plaintiffs' and Class members' residential mortgage loans.

**A.  Defendant services residential mortgage loans nationwide.**

24.    Defendant is one of the nation's largest providers of residential home mortgage loans. It services, and at all times relevant hereto has serviced, residential home mortgage loans nationwide.

25.    Defendant is a loan servicer and lender. It derives income in a number of ways including (a) payments based on a percentage of each borrower's principal balance pool, (b) float interest, (c) late fees, (d) foreclosure fees, (e) property inspection and preservation fees, and (f) broker opinion fees.

26.    Defendant is a wholly-owned and controlled subsidiary of Wells Fargo & Company (NYSE: WFC), one of the nation's largest financial institutions. Wells Fargo & Company is a Delaware corporation headquartered in San Francisco, California and a registered bank holding company.

27.    Wells Fargo & Company describes itself as a "diversified, community-based financial services company with $1.87 trillion in assets." *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (Nov. 6, 2018). It provides "banking, investment, and mortgage products and services as well as consumer and commercial finance, through 8,050 locations, 13,000 ATMs, digital (online, mobile, and social), and contact centers (phone, email, and correspondence)." *Id.* Wells Fargo & Company employs approximately 262,000 full-time employees in 37 countries and serves "one in three households in the United States." *Id.*

**B.  Defendant employs uniform, nationwide loan servicing, loan modification, and foreclosure practices.**

28.     Defendant utilizes uniform and standardized loan servicing, loan modification, and foreclosure practices nationwide. Much of Defendant's uniform and standardized loan servicing, loan modification, and foreclosure practices are reliant upon automated processes, systems, and tools.

29.     Defendant's loan servicing, loan modification, and foreclosure practices are governed by federal requirements and obligations.

30.     The Fair Federal Housing Agency ("FHA") is an agency within the United States Department of Housing and Urban Development ("HUD") that supplies mortgage insurance to FHA-approved lenders, insuring loans on single-family homes.

31.     Mortgage insurance protects lenders from the risk of borrower defaults because the FHA agrees to pay lenders in the event of borrower default.

32.     Lenders must be pre-approved to qualify for FHA mortgage insurance. They must also comply with HUD regulations.

33.     Defendant is a pre-approved lender who qualifies for FHA mortgage insurance. Defendant is therefore required to comply with HUD regulations.

34.     For loans that are protected by FHA mortgage insurance, Defendant and the borrower(s) executed loan documents that incorporate by reference HUD regulations.

35.     In 2008, the federal government began the Troubled Asset Relief Program (TARP). Pursuant to TARP, all servicers that receive funding from TARP must participate in HAMP.

36.     Defendant received about $25 billion in TARP funds. In return, Defendant agreed to participate in HAMP and be obligated by all Program Documentation (defined below).

37.     In 2009, the Secretary of the Treasury implemented the FHA HAMP, which was designed to minimize foreclosures by incentivizing loan modifications. Pursuant to HAMP, HUD has promulgated HAMP guidelines, regulations, and directives.

38.     Defendant is required to comply with all Program Documentation, HAMP, and other Department of Treasury directives.

39.     Among other things, Defendant is required to review defaulted loans for modification eligibility prior to proceeding with any foreclosure. Defendant is required to offer to all defaulted borrowers modifications for which they are eligible prior to conducting any foreclosure. HAMP guidelines require that Defendant undertake a number of specific and non-discretionary steps to determine a consumer's eligibility for modification or other relief. If, after completing a formula-driven net present value analysis, the modified loan would be more profitable than the non-modified loan, HAMP guidelines require that Defendant offer a trial period plan modification. If the borrower completes the trial period plan, Defendant is required to permanently modify the loan.

40.     To request a modification, the GSE ("government sponsored enterprise," such as Fannie Mae and Freddie Mac) Published Guidelines and FHA regulations require each borrower submit standardized form assistance applications, financial worksheets, hardship affidavits, and acknowledgment and agreements (the "Modification Contract"). Pursuant to the standard form Modification Contract, the borrower makes a legal representation as to the material truth of all information provided. The borrower agrees to provide all requested financial and hardship information. Among other things, the borrower also promises to undergo credit counseling if they are so requested. In return, Defendant agrees in the Modification Contract to examine the

borrower's eligibility for all available modifications. If the borrower is eligible for any available mandatory modifications, Defendant is required by the Modification Contract (as well as HAMP, other Department of Treasury directives, FHA regulations and binding GSE guidelines) to extend a trial period plan.[1]

41.     These standardized Modification Contracts incorporate all applicable obligations in the HAMP provisions, regulations, directives, guidelines, procedures, documentation, instructions, bulletins, frequently asked questions, letters, directives, and other communications issued by the Department of Treasury, GSEs, and federal agencies (collectively, "Program Documentation.").

42.     In all relevant communications with borrowers, Defendant represents that it will extend trial period plans to any borrower who is eligible for a mandatory modification under GSE guidelines and the HAMP.

43.     Defendant receives incentive payments for every successful modification under the Program Documentation. However, Defendant also benefits from unsuccessful modifications, along with foreclosures. If a federally mandated modification is not required, Defendant can offer modification and temporary payment plans outside of HAMP, often under terms that are less favorable to the borrower than federally-mandated plans. Furthermore, Defendant can continue to obtain foreclosure, late fees, property inspection, preservation, and broker opinion fees. What is more, Defendant receives higher float interest payments for non-modification options such as a

---

[1] In some circumstances, the Fannie Mae, Freddie Mac and FHA regulations and guidelines require lenders like Wells Fargo to evaluate borrowers who do not submit applications using the same criteria as for the underwritten applications, except for the consideration of the borrower's income. Some of these "Streamlined" modifications may also have been impacted by the software errors.

short sale or a foreclosure. It further receives higher principal balance pool payments if it does not reduce the principal balance pursuant to Program Documentation requirements.

**C.     Defendant repeatedly fails to oversee, test, and audit its uniform loan servicing, mortgage modification, and foreclosure practices.**

44.     In 2010, the Office of Comptroller of the Currency ("OCC") discovered multiple deficiencies and unsafe and unsound practices in Defendant's residential mortgage servicing, modification, and foreclosure programs. The OCC determined that Defendant failed to oversee, audit, and test its foreclosure and modification tools and practices and failed to comply with applicable laws, prioritizing profits over compliance and causing substantial harm to consumers.

45.     The OCC's investigation and related investigations resulted in millions in fines assessed by the Federal Reserve to Wells Fargo & Company.

46.     As a result, Defendant agreed to two consent orders with the OCC, committing to taking all necessary and appropriate steps to remedy the deficiencies and unsafe and unsound practices identified by the OCC. In the consent orders, Defendant agreed to form compliance committees and programs subject to the oversight of the OCC. It agreed to adopt processes to better oversee, audit, and conduct ongoing testing of its loan servicing, modification, and foreclosure tools and practices and ensure legal and regulatory compliance. Some such agreed processes were targeted at better oversight, auditing, and testing of automated tools, modification and foreclosure review, and fee assessments.

47.     But Defendant failed to remedy the deficiencies and unsafe and unsound practices identified by the OCC. It failed to adopt adequate oversight, auditing, and testing processes and programs. And it failed to detect and/or correct repeated and systemwide servicing, modification, and foreclosure process errors.

48.     In 2015, the OCC again determined that, despite the 2011 consent cease and desist orders, Defendant continued to fail to adequately oversee, audit, and test its servicing, modification, and foreclosure practices for compliance. As a result, the OCC assessed millions in monetary penalties against Defendant's parent company, Wells Fargo & Company.

49.     In early 2018, the OCC discovered additional and ongoing compliance and conduct failures in Defendant's loan servicing, modification, and foreclosure programs and processes. The OCC determined that Defendant's deficiencies and compliance failures constituted reckless and unsafe or unsound practices in violation of federal law and that Defendant failed to implement and maintain an adequate compliance risk management program. It found that Defendant failed to implement adequate oversight, control, auditing, and testing of its servicing, modification, and foreclosure programs and practices. The OCC also found that Defendant failed to adequately report compliance concerns, compliance failures, and Defendant's efforts to remedy them.

50.     As a result, Wells Fargo & Company and the Defendant entered into a consent cease and desist order with the OCC, again agreeing to adopt system-wide compliance programs and oversight.

51.     The Federal Reserve also issued a consent cease and desist order in early 2018 restricting Defendant's growth until governance, oversight, risk management, auditing, and testing is improved. In its consent cease and desist order, the Federal Reserve reports that it determined Defendant "pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management

framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."

52.     As a result of the OCC's continued investigations and resulting consent orders, Defendant was and is on notice of serious errors, deficiencies, and unsafe and unsound practices in its loan servicing, modification, and foreclosure processes and practices from 2010 through the present. Defendant was and is likewise aware of the need for oversight, testing and auditing of those processes and practices, including the need for oversight, testing, and auditing of automated tools. Yet Defendant has habitually failed to adopt adequate oversight, testing, and auditing.

**D.     Defendant's automated calculation errors.**

53.     Defendant's deficiencies, unsafe and unsound practices, and failure to conduct adequate oversight, auditing, and testing, resulted in a number of systemic automated calculation errors that greatly affected borrowers.

54.     From 2010 through 2019, Defendant utilized automated mortgage loan modification underwriting tools to determine which default borrowers are qualified for a mortgage loan modification or repayment plan.

55.     By its own admissions, Defendant repeatedly failed to test and audit its automated mortgage loan modification underwriting tool, despite the OCC investigations and consent decrees putting it on notice of significant issues with its mortgage practices. Defendant likewise failed to adequately verify that its automated mortgage loan modification tools and standard foreclosure practices complied with consent decree requirements, regulations, and laws.

56.     As a result, Defendant wrongfully failed to approve hundreds of borrowers for

appropriate mortgage loan modifications and/or repayment plans.

**E.    Defendant's "first" automated calculation error.**

57.    As a result of its continuing failure to implement adequate oversight, auditing, and test controls, Defendant failed to timely identify a number of automated calculation errors in its mortgage software.

58.    As reported by the OCC, between March of 2013 and October of 2014, an unidentified error caused Defendant to fail to offer modifications to at least 184 borrowers who were entitled to modification trial period plans.

**F.    Defendant's "second" automated calculation error.**

59.    Unbeknownst to the OCC, Defendant's "first" automated calculation error was not its only one.

60.    On August 3, 2018, Defendant's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (August 3, 2018) ("August Report"). In its report, Wells Fargo & Company revealed for the first time that it identified an automated calculation error that caused it to wrongfully deny loan modifications and resulted in hundreds of foreclosures of residential mortgage loans in default between April 13, 2010 and October 20, 2015:

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015, when the error was corrected. **This error in the modification tool caused an automated miscalculation of attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan**

**modification** pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie mac) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification, a foreclosure was completed.**

(Emphasis added).

61.     Defendant's August Report demonstrates that Defendant's loan modification underwriting tool utilized an automated calculation error for more than five years before it was corrected.

62.     During those five years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when, in reality, they were wrongfully prohibited from modifying their mortgage payments.

63.     During those five years, Defendant also wrongfully foreclosed on the homes of many of the consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

64.     Also during those five years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

65.     Moreover, subsequent legal disclosures reveal that Defendant identified its "second" accounting error in August of 2013. Defendant's employees discovered the error and escalated the problem to senior management.

66.     It was not until October 2, 2015 that Defendant implemented new controls purporting to address the accounting error and also replaced its system with the LPS/Black Knight Desktop Application. And Defendant did not disclose this accounting error to government regulators, the public, or affected borrowers until almost three years later, on August 3, 2018. Despite detecting this error, Defendant concealed it from the public and the OCC, likely in an attempt to avoid additional fines and further OCC supervision.

67.     Even after discovering the calculation error, Defendant continued to conduct foreclosures on the homes of borrowers negatively affected by its "second" calculation error.

68.     Even after discovering the calculation error, Defendant continued to issue inaccurate periodic statements and notices to affected borrowers.

69.     In its August Report, Defendant committed to dedicating $8 million towards remediating customers who were affected by Defendant's "calculation error."

70.     On or around September of 2018, Defendant sent form letters ("Apology Letters") to consumers affected by its "calculation error." In those letters, Defendant informed each consumer that, "[W]hen you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation and we're sorry. If it had been correct, you would have been approved for a trial modification."

71.    Although Defendant's letters state that it "*now* realize[s]" (emphasis added) it has made an error causing it to wrongfully fail to approve the consumer's modification, Defendant's August Report demonstrates that it has known about the error since August of 2013.

72.    In its Apology Letter to Plaintiffs Ryder, Plaintiff Chambers, Plaintiff Mann, and Plaintiff Thomas. Defendant enclosed a payment "to help make up for [the borrower's] financial loss." The enclosed payment was a check for about $15,000.00, or in the case of Plaintiffs Aguilar and Manley the check was for $25,000.00, an arbitrarily chosen modicum of the damages suffered by the borrower as a result of modification denial and resulting foreclosure. Neither the payment nor the Apology Letter was accompanied by a release. Indeed, in its Apology Letter, Defendant encouraged the borrower to cash the enclosed payment, and offer to attend additional mediation with the borrower (even if the borrower cashes the check) if the borrower does not believe the Defendant had "made things right."

73.    The approximately $15,000.00 or $25,000.00 payments were insufficient to compensate Plaintiffs Ryder, Plaintiff Chambers, Plaintiff Mann, Plaintiff Thomas, Plaintiff Aguilar and Plaintiff Manley for the damages caused by Defendant's unlawful actions and inactions as described herein.

74.    In short, Defendant's Apology Letters admit that its accounting error caused consumers to be wrongfully denied a loan modification, admit that its accounting error caused consumers harm, admit that its accounting error resulted in inaccurate negative reporting to consumer reporting agencies that should be corrected, and admits that Defendant had done nothing before September 2018 to remediate consumers and correct inaccurate credit reporting.

**G.     Defendant's "third" automated error.**

75.     Despite being on notice of its automated calculation errors discovered in 2013 and 2014, Defendant still failed to implement adequate oversight, auditing, and testing compliance controls. That failure resulted in additional automated errors causing Defendant to wrongfully refuse to provide modifications on hundreds of additional borrowers' homes.

76.     On November 6, 2018, Defendant's parent company Wells Fargo & Company issued its Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. *Wells Fargo & Company*, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), p. 3, (November 6, 2018) ("November Report"). In its November Report, Wells Fargo & Company disclosed for the first time a third set of related calculation errors affecting an additional 245 consumers, which was identified using a "subsequent expanded review." The November Report also indicates that the first accounting error was actually corrected on October 2, 2015 (as opposed to October 20, 2015 as stated in the August Report):

> An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error regarding foreclosure attorneys' fees affecting certain accounts that were in the foreclosure process between April 3, 2010, and October 2, 2015, when the error was corrected. **A subsequent expanded review identified related errors regarding the maximum allowable foreclosure attorneys' fees permitted for certain accounts that were in the foreclosure process between March 15, 2010, and April 30, 2018, when new controls were implemented. Similar to the initial calculation error, these errors caused an overstatement of the attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises** (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA) and the U.S. Department of Treasury's Home Affordable Modification Program (HAMP). Customers were not actually charged the incorrect attorneys' fees. **As a result of these errors, taken together and subject to final validation, approximately 870 customers were incorrectly denied a loan modification or were not offered a loan modification or repayment plan in cases where they otherwise would have qualified. In**

**approximately 545 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification or repayment plan, a foreclosure was completed.** The Company has contacted a substantial majority of the approximately 870 affected customers to provide remediation and the option also to pursue no-cost mediation with an independent mediator. Attempts to contact the remaining affected customers are ongoing. Also, the Company's review of these matters is ongoing, including a review of its mortgage loan modification tools.

(Emphasis added).

77. The November Report demonstrates that Defendant's loan modification underwriting tool suffered from the attorneys' fee calculation error for more than eight years.

78. During those eight years, Defendant wrongfully reported inaccurate information to credit reporting agencies regarding the residential mortgage loans of consumers affected by its calculation error. Namely, Defendant reported to credit reporting agencies that borrowers were in default on their residential home loans, when in reality they were wrongfully prohibited from modifying their mortgage payments. And meanwhile, borrowers faced the consequences, including increased borrowing costs, loss of equity and the appreciation of their home, legal fees, devastating impacts to consumer credit, and incidental costs related to the sudden need to move.

79. During those eight years, Defendant also wrongfully foreclosed on the homes of consumers affected by its calculation error—consumers who should have been offered loan modifications instead of facing foreclosure.

80. Also during those eight years, on information and belief, Defendant issued periodic statements and notices in connection with consumers' residential home mortgage loans that contained inaccurate information as a result of the automated calculation error.

81. The November Report also admits that Defendant was aware of the accounting error on or before April 30, 2018. But Defendant did not disclose this accounting error to the public or affected borrowers until almost six months later, on November 6, 2018.

82. Despite knowing that its automated errors harmed consumers (and admitting in its Apology Letter that it was appropriate to request consumer reporting agencies remove any negative reporting), Defendant made no effort before November of 2018 to rescind the inaccurate and negative information reported to credit reporting agencies regarding consumers affected by the automated errors.

83. Every additional week and month that a mortgagor spends in the "default zone" with regard to their mortgage materially and negatively affects the mortgagor's credit. Every additional week and month that a mortgagor is stuck in the "default zone" is another week or month where the mortgagor is limited in ability to pay, purchase, buy, earn, rent, or maybe even obtain or continue gainful employment. Every additional week or month in this "default zone" is another week or month accruing damages that are more difficult to recover from each subsequent week or month.

84. In Exhibit 13 to its most recent Form 10-K Annual Report, Defendant disclosed that "[t]his effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

### H. The *Hernandez* Litigation.

85. Before this action was filed, another Wells Fargo victim filed a putative class action in the Northern District of California. *Hernandez v. Wells Fargo Bank, N.A.*, 3:18-cv-07354-WHA (N.D. Cal.).

86. On April 1, 2020, Defendant and class plaintiffs in *Hernandez v. Wells Fargo Bank, N.A.*, 3:18-cv-07354-WHA (N.D. Cal.) filed a motion for preliminary approval of settlement. *See Hernandez*, Motion for Preliminary Approval of Class Settlement, Doc. 269 (N.D. Cal. Apr. 1, 2020).

87. The *Hernandez* Plaintiffs' Motion for Preliminary Approval of Class Settlement was granted on April 19, 2020. *See Hernandez*, Order Granting Preliminary Approval of Class Settlement, Doc. 277 (N.D. Cal. Apr. 19, 2020).

88. In his Order granting Preliminary Approval of the Class Settlement in *Hernandez*, Judge Alsup certified the following nationwide class pursuant to Civ. R.23(b)(3):

> All persons in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo sold in foreclosure.

*Id.*; *see also Hernandez*, Motion for Preliminary Approval of Class Settlement, Doc. 269 at pp. 12-13; *see also Hernandez,* Order Granting Preliminary Approval of Class Settlement, Doc. 277 at pp. 1-2 (N.D. Cal. Apr. 19, 2020).

89. The Court granted final approval of the *Hernandez* settlement on October 12, 2020, Dec. 292.

90. The Plaintiffs in this case are not a part of the class receiving relief as members of the *Hernandez* class.

## IV.     PLAINTIFF ETHAN RYDER'S FACTUAL ALLEGATIONS

91.    On March 27, 2009, Plaintiff Ryder entered into a mortgage related to the Ryder Property.

92.    In the fall of 2011, Plaintiff Ryder contacted Defendant in anticipation of proposed default.

93.    Between December 1, 2011 and February 2, 2012, Plaintiff Ryder submitted a facially complete application for loss mitigation as well as a short sale application to be reviewed by Defendant as was required of Defendant.

94.    On February 2, 2012, Defendant issued written correspondence to Plaintiff Ryder notifying him that he did not qualify for a HAMP Modification.

95.    On or about April 22, 2012, Plaintiff Ryder submitted a second application again seeking loss mitigation.

96.    Between May 22, 2012 and June 17, 2012, Defendant reviewed the second application as facially complete. On June 18, 2012, Defendant generated a letter to Plaintiff Ryder notifying him that his second application was denied.

97.    On or about June 22, 2012, Plaintiff Ryder received a letter from Defendant dated June 20, 2012, indicating his loan was returning to collections.

98.    Much to his surprise, Plaintiff Ryder received correspondence from Defendant dated November 27, 2012, which notified him that Defendant would be reviewing him for mortgage assistance, including loan modification, and if he did not qualify for a loan modification, Defendant would review for "other options".

99.    On or about January 24, 2013, Defendant notified Plaintiff Ryder that no options were available.

100.     Eventually, on August 12, 2013, Plaintiff Ryder was forced to sell the Ryder Property in a short sale.

101.     Also as a result of Defendant's failure to modify Plaintiff Ryder's loan and the loss of his home, Plaintiff Ryder suffered significant mental anguish which affected his personal and professional relationships.

102.     More than eight years later, Defendant sent Plaintiff Ryder a form Apology Letter dated September 12, 2018. The form Apology Letter inaccurately states that Defendant has just now realized that it committed an error and that Plaintiff Ryder should have been approved for a trial modification. The form Apology Letter acknowledges that Defendant's error affected Plaintiff Ryder at a time when he was facing a hardship. It admits that Defendant is obligated to "make things right."

103.     This was the first time Plaintiff Ryder learned that Defendant had committed an accounting error and that his modification request should have been approved. Never in the years since being forced to sell the Ryder Home did Defendant attempt to discuss with Plaintiff Ryder its accounting error or its wrongful failure to provide mortgage assistance.

104.     Along with the Apology Letter, Defendant enclosed a check for $15,000.00. This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

105.     Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Ryder was eligible), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home caused Plaintiff Ryder significant economic and non-economic damages.

## V.     PLAINTIFF JAMES CHAMBERS' ALLEGATIONS

106.     In November 2007, Plaintiff James Chambers ("Chambers") entered into a mortgage with Wells Fargo for his residence in Florence, New Jersey.

107.     Between April 2012 and April 2013, Chambers worked with a third-party non-profit agency to submit a facially complete loss mitigation packet to Wells Fargo. The packet was finally considered facially complete and submitted for review on or about April 15, 2013.

108.     On or about May 7, 2013, Chambers was notified that his application was denied due to lack of feasibility.

109.     Following the May 7, 2013 denial, Chambers submitted a new packet which was considered facially complete on or about June 10, 2013.

110.     On or about September 30, 2013, Chambers received notice that his June 2013 application had been approved for a loan modification.

111.     From October 2013 through December 2013, Chambers paid three trial plan payments to Wells Fargo.

112.     On or about January 28, 2014, Chambers executed the permanent modification and began making the modified payments as of February 1, 2014.

113.     Chambers eventually defaulted on these payments and Wells Fargo initiated foreclosure proceedings in September 2014.

114.     The property was sold at sheriff sale in August 2018 by Wells Fargo.

115.     In March 2019, Chambers was evicted from the property.

116.     On or about November 23, 2019, Chambers received the form Apology Letter dated November 22, 2019, which inaccurately states that Defendant has just now realized that it committed an error and that Plaintiff Chambers should have been approved for a trial modification with the 2012 application. The form Apology Letter acknowledges that Defendant's error affected Plaintiff Chambers at a time when he was facing a hardship. It admits that Defendant is obligated to "take this matter seriously"

117.     This was the first time Plaintiff Chambers learned that Defendant had committed an accounting error and that his modification request should have been approved. Never during the review of the second modification nor during the course of the almost four-year foreclosure proceedings did the Defendant attempt to discuss with Plaintiff Chambers its accounting error or its wrongful failure to provide mortgage assistance.

118.     Along with the Apology Letter, Defendant enclosed a check for $5,707.00.  This payment is insufficient to compensate him for the harm he suffered as a result of Defendant's wrongful practices.

119.     Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Chambers was eligible), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of his home caused Plaintiff Chambers significant economic and non-economic damages.


## VI.     PLAINTIFF MAUREEN MANN'S ALLEGATIONS

120.     On or about 2007, Plaintiff Mann entered into a mortgage related to the Mann Property.

121. In early 2013, Plaintiff Mann contacted Defendant to request assistance with her loan because of an anticipated, potential default.

122. Between approximately April 2013 and early 2014, Plaintiff Mann submitted a facially complete application for loss mitigation, as well as a short sale application, to be reviewed by Defendant, as was required by Defendant.

123. On or about November 2013, Defendant issued written correspondence to Plaintiff Mann notifying her that she did not qualify for a HAMP modification.

124. Eventually, on or about May 2014, Plaintiff Mann was forced to sell the Mann Property in a short sale.

125. As a result of Defendant's failure to modify Plaintiff Mann's loan and the loss of her home, Plaintiff suffered significant mental anguish which affected her personal and professional relationships.

126. More than four years later, Defendant sent Plaintiff Mann a form Apology Letter dated September 12, 2018. The form Apology Letter inaccurately stated that Defendant just now realized that it committed an error, and that Plaintiff should have been approved for a trial modification. The form Apology Letter acknowledged that Defendant affected Plaintiff Mann at a time when she was facing a hardship. It admitted that Defendant was obligated to "make it right."

127. This was the first time Plaintiff Mann learned that Defendant had committed an accounting error and that her modification request should have been approved. Never in the years since being forced to sell the Mann Home did Defendant attempt to discuss with Plaintiff Mann its accounting error or its wrongful failure to provide mortgage assistance.

128.     Along with the Apology Letter, Defendant enclosed a check for $15,000.00. This payment is insufficient to compensate her for the harm she suffered as a result of Defendant's wrongful practices.

129.     Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Mann was eligible), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of her home, caused Plaintiff Mann significant economic and non-economic damages.

## VII.    PLAINTIFF VIOLA THOMAS'S ALLEGATIONS

130.     On July 23, 2007, Plaintiff Thomas entered into a mortgage with Mid Atlantic Capital LLC related to the Thomas Property.

131.     Wells Fargo Service acquired the mortgage around February 2008.

132.     In May of 2008, Plaintiff Thomas was approved for a temporary forbearance plan.

133.     In June of 2008, Plaintiff Thomas applied for a modification review.

134.     In August of 2008, Defendant Wells Fargo initiated foreclosure proceedings.

135.     On September 30, 2008, Plaintiff Thomas's modification was denied due to being unable to post a modification payment.

136.     On November 11, 2008, Plaintiff Thomas initiated another modification review.

137.     On January 2, 2009, Plaintiff Thomas was approved for Partial Reinstatement/Repayment plan.

138.     On January 9, 2009, Defendant suspended foreclosure proceedings.

139.     On January 12, 2009, Plaintiff Thomas's modification application was removed from review and sent to collections to monitor her repayment plan.

140.     On April 7, 2009, Plaintiff Thomas again initiated a modification review

141.     On May 14, 2009, Plaintiff Thomas was approved for a HAMP 90-day trial modification.

142.     Between June and October 2009, Plaintiff Thomas made trial payments on her trial HAMP modification.

143.     On December 1, 2009, Plaintiff Thomas attempted to make a trial payment on her mortgage, but this payment was returned for insufficient funds.

144.     From December 8, 2009 through March 2010, Plaintiff Thomas continued to make payments on her trial HAMP modification.

145.     On March 29, 2010, Defendant denied Plaintiff Thomas's application for Modification due to forbearance with Loan to Value less than 100%. Review was continued for other options.

146.     On March 30, 2010, Defendant resumed foreclosure proceedings.

147.     On April 9, 2010, Plaintiff Thomas again applied for a loan modification.

148.     On May 24, 2010, Defendant again denied Plaintiff's modification application due to forbearance with Loan to Value less than 100%, and again review was continued for other options.

149.     On June 4, 2010, Plaintiff Thomas was approved for a partial reinstatement/repayment plan.

150.     On June 16, 2010, Plaintiff Thomas's modification application was removed from modification review and sent to collections for payment monitoring and foreclosure proceedings were suspended.

151.    Between July 2010 and October 2010, Plaintiff Thomas made payments on her repayment plan.

152.    In November 2010, Plaintiff Thomas submitted a facially complete application for loss mitigation to be reviewed by Defendant as was required of Defendant.

153.    On February 17, 2011, Defendant notified Plaintiff Thomas that she did not qualify for a HAMP Modification.

154.    On March 25, 2011, Defendant denied Plaintiff Thomas's application for a Non-HAMP modification.

155.    On March 25, 2011, Defendant resumed foreclosure proceedings on the Thomas Property.

156.    Between April and October 2011, the Thomas property was reviewed and denied for short sale three times.

157.    Eventually, on January 17, 2012, Plaintiff Thomas was forced to sell the Thomas Property in a short sale.

158.    Plaintiff Thomas received the form Apology Letter dated June 17, 2019, which inaccurately states that Defendant has just now realized that it committed an error and that Plaintiff Thomas should have been approved for a trial modification with the November 2010 application. The form Apology Letter acknowledges that Defendant's error affected Plaintiff Thomas at a time when she was facing a hardship.

159.    This was the first time Plaintiff Thomas learned that Defendant had committed an accounting error and that her modification request should have been approved. Never in the years

since being forced to sell the Thomas Property did Defendant attempt to discuss with Plaintiff Thomas its accounting error or its wrongful failure to provide mortgage assistance.

160.    Along with the Apology Letter, Defendant enclosed a check for $14,000.00 and offered mediation "[i]f you don't feel that we've made things right."

161.    Plaintiff Thomas opted to pursue the offered mediation and was awarded an additional amount which was paid to Plaintiff Thomas by the defendant on January 3, 2020.

162.    These payments are insufficient to compensate her for the harm she suffered as a result of Defendant's wrongful practices.

163.    Defendant's repeated refusal to provide mortgage assistance (to which Plaintiff Thomas was eligible), Defendant's refusal to correct its error after identifying its automated calculation errors, along with the loss of her home caused Plaintiff Thomas significant economic and non-economic damages.

## VIII.   PLAINTIFF KIMBERLY DUNCAN'S ALLEGATIONS

164.    On or about April 25, 2011, Plaintiff Duncan executed a Note and Mortgage (collectively the "Loan") on the Duncan Property with Fairway Independent Mortgage Corporation.  Shortly after this Loan closed, the ownership and servicing of the Loan were transferred. From November 22, 2011, to February 25, 2014 Wells Fargo was the servicer of the Loan.

165.    On or around August 2011, Plaintiff Duncan fell upon financial difficulties and defaulted on the Loan.

166.    Shortly after falling delinquent Plaintiff Duncan contacted Wells Fargo for a loan modification.

167.    On August 10, 2012, with the application still pending, Wells Fargo filed a foreclosure action in the Ocean County Superior Court, Case No. F-015994-12 (the "Foreclosure Case").

168.    On July 26, 2013, Wells Fargo made the decision to deny Plaintiff Duncan's second request for a loan modification due to automated calculation error.

169.    Shortly after, Wells Fargo representatives informed Plaintiff Duncan of the denial of the loan modification and advised Plaintiff Duncan to give up the Duncan Property through a short sale.  Plaintiff Duncan, relying on Wells Fargo's representations, began pursuing the short sale.

170.    In February 2014, Plaintiff Duncan sold the Duncan Property through a short sale. As a result of the short sale, Plaintiff Duncan incurred nearly $24,000.00 in settlement charges at closing which included $21,000.00 for the forced use of a real estate agent.

171.    Almost four and a half years later, on or about September 12, 2018, Wells Fargo sent Plaintiff Duncan a form apology letter.  The form apology letter inaccurately states that Wells Fargo has just now realized that it committed an error and that Plaintiff Duncan should have been approved for a trial modification. The apology letter acknowledges that Wells Fargo's error affected Plaintiff Duncan at a time when she was facing a hardship and admits that Wells Fargo is obligated to "make things right."

172.    This was the first time Plaintiff Duncan learned that Wells Fargo had committed an accounting error and that her modification request should have been approved. Never in the years since the foreclosure and short sale did Wells Fargo attempt to discuss with Plaintiff Duncan its accounting error or its wrongful failure to provide mortgage assistance.

173.    Along with the apology letter, Wells Fargo enclosed a check for an amount that Plaintiff Duncan did not believe is anywhere close to enough to compensate her for the harm she suffered as a result of Wells Fargo's wrongful practices.

174.    As instructed in the apology letter Plaintiff Duncan submitted the Mediation Request Form and enclosed a detailed explanation as to her reasons for requesting mediation and her ideas for reasonable compensation.

175.    On or about October 11, 2018, Wells Fargo responded to the Mediation Request Form with a second letter and a second payment for an amount that Plaintiff Duncan did not believe is anywhere close to enough to compensate her for the harm she suffered as a result of Wells Fargo's wrongful practices.

176.    Wells Fargo's repeated refusal to provide mortgage assistance (to which Plaintiff Duncan was entitled), Wells Fargo's refusal to correct its error after identifying its automated calculation errors, along with the loss of the forced short sale of her home caused Plaintiff Duncan significant stress and anxiety. Plaintiff Duncan's personal relationships and credit suffered as a result of Wells Fargo's refusal to modify their loan, Wells Fargo's reports to consumer reporting agencies, and the ultimate foreclosure. Plaintiff Duncan suffered opportunity costs and lost her home, as well as the equity, appreciation, associated tax benefits, and as described above the incurring of $24,000.00 in short-sale related expenses. Plaintiff Duncan wrongfully lost the opportunity to receive HAMP incentive payments, or other methods of curing the default (including refinancing options), and wasaffected by negative credit reporting. Plaintiff Duncan also suffered moving and housing costs. The exact monetary value of damages suffered by Plaintiff Duncan as a result of Wells Fargo's wrongful practices is unknown at this time.

## IX. THE ALLEGATIONS OF PLAINTIFFS JOSE AGUILAR AND ELIZABETH MANLEY

177.     On December 30, 2005, Aguilar and Manley purchased the Aguilar/Manley Property. Aguilar and Manley executed a note and executed a mortgage on the Aguilar/Manley Property that secures said note. From August 29, 2011 to September 22, 2014, Wells Fargo was the servicer of Aguilar and Manley's mortgage loan.

178.     In 2011, Aguilar and Manley fell upon hard times. In or about May 2011, Aguilar and Manley missed their first mortgage payment, defaulting on their loan pursuant to the provisions in their standard-form mortgage. Wells Fargo reported Aguilar and Manley's default to credit reporting agencies.

179.     On August 17, 2012, Wells Fargo filed foreclosure in the Supreme Court of the State of New York, County of Madison, Index No. 1656/2012 (the "Aguilar/Manley Foreclosure").

180.     Aguilar and Manley sought mortgage assistance from Wells Fargo throughout his default. In 2013, they requested mortgage assistance. In or about September 2013, as a result of Wells Fargo's automated calculation errors, Wells Fargo erroneously determined that Aguilar and Manley were not qualified for a mortgage loan modification or temporary payment plan pursuant to the requirements of government-sponsored enterprises, the FHA, or HAMP. In or about September 2013, Wells Fargo wrongfully denied Aguilar and Manley's mortgage assistance due to applying the incorrect eligibility requirements to the loan.

181.     Aguilar and Manley complied with all obligations imposed by Wells Fargo. Indeed, Wells Fargo admits that, but for its accounting error, their modification request would have been granted.

182. After service of Aguilar and Manley's loan was transferred, on July 30, 2015, the foreclosure court granted an Order of Judgment of Foreclosure and Sale. On November 30, 2015, the Aguilar/Manley Property was sold at a Sheriff's sale.

183. Since Aguilar and Manley lost their home because of Wells Fargo's calculation errors, Wells Fargo's actions directly and proximately caused Aguilar and Manley's damages. If Wells Fargo would have offered a HAMP TPP to Aguilar and Manley, they would have accepted the offer because they intended to remain in their home. Aguilar and Manley intended to timely and properly make every TPP payment and every permanent modification payment.

184. As a result of Wells Fargo's failure to modify Aguilar and Manley's loan and the loss of their home, Aguilar and Manley were forced to pay moving expenses and rent payments and suffered significant mental anguish which affected their personal and professional relationships, including dissolution of their marriage.

185. More than eight years later, Wells Fargo sent Aguilar and Manley a form apology letter dated September 18, 2018. The form apology letter inaccurately states that Wells Fargo has just now realized that it committed an error and that Aguilar and Manley should have been approved for a trial modification. The apology letter acknowledges that Wells Fargo's error affected Aguilar and Manley at a time when they were facing a hardship and admits that Wells Fargo is obligated to "make things right."

186. This was the first time Aguilar and Manley learned that Wells Fargo had committed an accounting error and that their modification request should have been approved. Never in the years since their foreclosure did Wells Fargo attempt to discuss with Aguilar and Manley its accounting error or its wrongful failure to provide mortgage assistance.

187. Along with the apology letter, Wells Fargo enclosed a check for an amount that Aguilar and Manley do not believe is anywhere close to enough to compensate them for the harm they suffered as a result of Wells Fargo's wrongful practices.

188. Wells Fargo's repeated refusal to provide mortgage assistance (to which Aguilar and Manley were entitled), Wells Fargo's refusal to correct its error after identifying its automated calculation errors, along with the loss of their home caused Aguilar and Manley significant stress and anxiety. Aguilar and Manley's personal relationships and credit suffered as a result of Wells Fargo's refusal to modify their loan, Wells Fargo's reports to consumer reporting agencies, and the ultimate foreclosure. Aguilar and Manley suffered opportunity costs and lost their home, as well as the equity, appreciation, and associated tax benefits. Aguilar and Manley wrongfully lost the opportunity to receive HAMP incentive payments and other methods of curing their default (including refinancing options) were affected by negative credit reporting. Aguilar and Manley also suffered moving and housing costs. The exact monetary value of damages suffered by Aguilar and Manley as a result of Wells Fargo's wrongful practices is unknown at this time.

## X. CLASS ACTION ALLEGATIONS

### A. The Class Definition.

189. **The Class:** Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(3) and (b)(1), on behalf of similarly situated individuals and entities ("the Class") defined as follows:

> All persons, as identified by Defendant constituting approximately 1,830 mortgagors and for which Defendant was the mortgagee or servicer, in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), or the U.S. Department of Treasury's Home Affordable Modification

Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Defendant due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo did not sell in foreclosure.

Excluded from this class are Defendant's officers, directors, and employees; the judicial officers and associated court staff assigned to this case; and the immediate family members of such officers and staff.

**B.     Fed. R. Civ. P. 23(a)(1): Numerosity.**

190.    Based upon mutually agreed upon disclosures during the pendency of this action, the Plaintiffs have determined that the number of Class members will be 1,830 members. Class members can easily be identified through Defendant's records, or by other means.

191.    The definition of the Class is unambiguous, and Plaintiffs are members of the Class they seek to represent.

192.    Nevertheless, Plaintiffs reserve the right to amend or modify the Class definitions, for example, to create greater specificity, divide into additional subclasses, or limit particular issues as the case progresses.

193.    The Class is so numerous and geographically dispersed that joining all the Class members would be impracticable.

194.    Plaintiffs and the Class satisfy the requirements of Rule 23(b)(1)(A), (b)(1), and/or (b)(3).

**C.     Fed. R. Civ. P. 23(a)(2) and (b)(3): Commonality and Predominance.**

195.    Plaintiffs' claims are typical of the Class because Plaintiffs' claims have the same essential characteristics as all other Class members' claims and the evidence to establish the facts and claims stated herein will be the same for Plaintiff and all other members of the Class. All claims are based on the same course of conduct and similar legal theories. All Class members,

including Plaintiffs, suffer the same types of injuries and possess the same interests in pursuing this case as do Plaintiffs. A single resolution of these claims would be preferable to a multiplicity of similar actions.

196. There are common questions of law and fact subject to answers common to all Class members that predominate over any questions affecting only individual members, including but not limited to:

a. What calculation and related errors occurred in Defendant's mortgage loan modification underwriting tool and/or related software between 2010 and 2018?

b. What were Defendant's common policies and practices regarding its oversight, inspection, auditing, testing, review, repair, and control of automated loan modification tools and related software between 2010 and 2018?

c. What were Defendant's common policies and practices regarding the inspection, verification, and reporting of negative information to credit reporting agencies between 2010 and 2018?

d. What were Defendant's common policies and practices regarding rescinding or correcting negative information that was erroneously reported to credit reporting agencies between 2010 and 2018?

e. How and when did Defendant discover errors in its automated loan modification tools and related software?

f. What actions and/or disclosures did Defendant take and/or make each time it discovered errors in its automated loan modification tools and related software?

g. When was Defendant on notice of the risk of errors in its automated loan modification tools due to inadequate oversight, auditing, and testing compliance mechanisms?

h. Did Defendant undertake any effort to correct its erroneous reporting to credit reporting agencies prior to September of 2018?

i. Did Defendant owe contractual obligations to Class members by failing to approve them for loan modifications or repayment plans for which they were qualified pursuant to pursuant to the requirements of government sponsored enterprises, the FHA, and HAMP?

j. Did Defendant breach those contractual obligations?

k. Was Defendant's conduct extreme and outrageous?

l. Did Defendant intentionally, with substantial certainty, or with reckless indifference cause serious emotional harm to members of the Class?

m. Did Defendant conceal or misrepresent to members of the Class its automated calculation errors and/or their entitlement to loan modifications?

n. Was any such concealment or misrepresentation material to members of the Class's loan modification?

o. Did Defendant conceal or misrepresent material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity?

p. Was the Class members' property in active foreclosure at the time of the calculation error?

q. Was the mortgage held by Wells Fargo paid in full by the Class member following an application for modification being denied due to the calculation error?

r. Was the mortgage held by Wells Fargo service transferred and then had foreclosure initiated against the Class member within twelve months of the service transfer following an application for modification being denied due to the calculation error?

s. Was the mortgage held by Wells Fargo satisfied via short sale proceeds from the class member following an application for modification being denied due to the calculation error?

t. Was the Class members' mortgage subsequently modified by Wells Fargo following an application for modification being denied due to the calculation error?

**D.     Fed. R. Civ. P. 23(a)(3): Typicality.**

197.   The claims of the Plaintiffs are typical of the claims of the Class because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making it appropriate for the Court to render final relief regarding the Class as a whole. For example:

a. Plaintiffs were subject to a mortgage on a residential home mortgage loan that was owned and/or serviced by Defendant on or after March 15, 2010.

b. Plaintiffs' loans entered loss mitigation review on or after March 15, 2010.

c. Plaintiffs qualified for mortgage loan modification trial period plans pursuant to HAMP.

d.   Defendant improperly denied Plaintiffs appropriate loss mitigation review and tools.

e.   That denial was a result of automated calculation and related errors pertaining to Defendant's use of mortgage loan modification and underwriting tool. Had Defendant not based its decision on a faulty calculation, Plaintiffs would have been approved for trial modifications.

f.   As such, Plaintiffs are members of the Class.

198.   Defendant's actions and inactions described above violated Plaintiffs' and the Class's statutory and common law rights.

199.   Plaintiffs and all members of the Class have suffered damages as a result of Defendant's actions and inactions described above.

200.   Further, Defendant's actions toward Plaintiffs are substantially similar, including: (1) Defendant's failure to approve Plaintiffs and the Class for temporary trial modification plans were the result of the same accounting and related errors, affecting the same calculation of attorneys' fees, effectuated using the same mortgage loan modification underwriting tool; (2) Defendant admits that, had it not based its modification decision regarding Plaintiffs and members of the Class on a "faulty calculation" Plaintiffs and all members of the Class would have received trial modifications; (3) Defendant utilized common and uniform policies, forms, and procedures when considering Plaintiffs' and all Class members' loans for modification; and (4) Plaintiffs' claims are predicated on duties and actions identical to Defendant's duties and actions owed and taken in regard to all Class members' residential real property loans.

201.    A class action is superior to other available methods for resolving adjudication of the Class members' claims fairly and efficiently because:

a.    It will avoid a multiplicity of suits and consequent burden on the courts and Defendant;

b.    It would be virtually impossible for all members of the Class to intervene as parties-plaintiffs in this action;

c.    It would assure uniform application of the laws and a single, uniform decision across the board without sacrificing procedural fairness or bringing about other undesirable results;

d.    It will provide court oversight of the claims process, once Defendant's liability is adjudicated;

e.    It would permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender; and

f.    It will permit the adjudication of relatively small claims by certain Class members, who could not afford to individually litigate such claims against a large corporate Defendant.

**E.    Fed. R. Civ. P. 23(a)(4): Adequacy of Representation.**

202.    Plaintiffs will fairly and adequately protect the interests of the Class.

203.    Plaintiffs come before this Court as victims of Defendant. They were the mortgagors of loans that were in default and serviced by Defendant. They were qualified for mortgage loan modification or repayment plans. But due to Defendant's calculation and other automated errors, they were wrongfully denied modification, and subsequently damaged.

204.    Plaintiffs' counsel will fairly and adequately prosecute the case on behalf of Plaintiffs and the Class.

205.    Plaintiffs' counsel are experienced trial attorneys who have engaged in extensive trial practice and have considerable experience in all aspects of class and mass tort litigation from several other class action and mass tort cases, including class action and mass tort cases against lenders and loan servicers.

206.    Plaintiffs' counsel have the necessary skills, expertise, and competency to adequately represent Plaintiffs' interests and those of the Class.

## XI.    TOLLING ALLEGATIONS FOR ALL CLAIMS

207.    The causes of actions alleged herein by the Plaintiffs against Defendant did not accrue or were tolled until the Plaintiffs discovered, or could have discovered with exercise of reasonable diligence, the facts giving rise to their legal claims. Based upon the allegations contained herein the earliest any of the Plaintiffs could have learned of their claims was September 13, 2018.

208.    Based upon the allegations contained herein the Plaintiffs had no realistic possibility until receiving the Apology Letters to know that (a) they qualified for a loan modification and (b) they were denied wrongfully for a mortgage modification based on a miscalculation done by Defendant's automated decision-making tool that was exclusively under the control of Defendant at all times (as it remains).

209.    Based upon the allegations contained herein the Plaintiffs had no realistic ability to discover any facts only known to Defendant regarding the wrongful denial for the mortgage modifications submitted between 2010 and 2015. Defendant's automated decision-making tool is

not public, and the mathematical calculations used to determine eligibility for any mortgage modification depend solely on variables within Defendant's exclusive control or information provided exclusively to Defendant.

210.    Based on all of the foregoing, any applicable statutes of limitations are also tolled by Defendant's knowing, active, and ongoing concealment of the facts alleged herein. Defendant discovered at least one, if not multiple, software errors back in August 2013 which contributed to the wrongful denial of loans modifications of the Plaintiffs or any borrower similarly situated. Based on the allegations contained herein and each 10-Q issued by Wells Fargo & Company since August 2018, Defendant deliberately concealed any information regarding the wrongful denial until September 13, 2018. Defendant has a continuous duty to disclose the truth to the Plaintiffs and based upon the actions herein the Plaintiffs reasonably relied on Defendant's on-going concealment until taking the actions to procure discovery described herein.

## XII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION: BREACH OF FORM CONTRACT

211.    Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

212.    Plaintiffs and each member of the Class entered into a contract with Defendant. The terms of the contract are set forth in the uniform borrower assistance form and the Security Instruments underlying the mortgage, typically referred to as a mortgage, deed of trust, or security deed (collectively, except where inappropriate, the "Form Contract"). The Form Contract is a standard form document containing identical provisions as required by GSEs, HUD, and the HAMP.

213.    Although HAMP and other government-mandated mortgage modifications were promulgated after Plaintiffs and the other Class members entered into the Form Contracts with Defendant, a reasonable interpretation of the Form Contracts required Defendant to provide Plaintiffs and the Class members all available options to cure a default at the time of default, which was after the effective date of HAMP and other government-mandated mortgage modifications.

214.    The Form Contract required Plaintiffs and each member of the Class to (among other things) certify under penalty of perjury that the information provided is truthful, provide authority to investigate their financial status, and agree to credit counseling.

215.    In consideration, Defendant agreed via the Form Contract to evaluate Plaintiffs and each member of the Class for temporary payment plan or modification program in compliance with the GSE, HUD, and HAMP requirements. Defendant agreed via the Form Contract to offer Plaintiffs and each member of the Class the best temporary payment plan or modification program for which they were eligible.

216.    The Form Contract governs the relationship between Plaintiffs and members of the Class and Defendant with regard to temporary payment plan and modification programs pursuant to GSE, HUD, and HAMP requirements and incorporates by reference those GSE, HUD, and HAMP requirements. The Form Contract is signed by Plaintiffs and each member of the Class. If Plaintiffs or a member of the Class missed a mortgage payment, Defendant was to send correspondence informing the mortgagor the amount owed and inviting the mortgagor to call Defendant's "trained professionals" to help "determine the best option available" to the

mortgagor. One such option was a loan modification, which could cure a default and bring a loan to "current" status.

217.    Plaintiffs and each member of the Class provided documents, information, and certifications in compliance with the Form Contract.

218.    As a result, Defendant was required under the terms of the Form Contract to consider Plaintiffs and each member of the Class for a loan modification and to provide that loan modification if appropriate. Plaintiffs and each member of the Class were eligible for a GSE, HUD, or HAMP temporary payment plan or loan modifications. But Defendant did not offer Plaintiffs or each member of the Class any temporary payment plan or loan modification. Defendant failed to do so because of a faulty automated calculation. Had that automated calculation been correct, Plaintiffs and each member of the Class would have been approved for a trial modification. Defendant breached its obligations to Plaintiffs and each member of the Class under the Form Contract.

219.    Defendant's breach impacted Plaintiffs and members of the Class at a time when they were experiencing extreme hardship. As a result of the faulty automated calculation, Defendant incorrectly provided negative credit information to consumer reporting agencies. Plaintiffs and members of the Class were not offered trial modifications and/or were offered less beneficial modification plans. Ultimately, Plaintiffs were damaged by Defendant's breach.

220.    Defendant also breached its duties under the Form Contract by failing to give them adequate notice of the mortgage modification.

221.    Defendant discovered its "first" automated calculation error on or before October 2, 2015. While Defendant states that it fixed the first automated calculation error on October 2,

2015, it failed to disclose the error to the public until August 3, 2018, and failed to disclose the error to individuals it affected until September of 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Class to suffer significant harm, Defendant did nothing for almost three years to mitigate the harm it caused to Plaintiffs and members of the Class, keeping the accounting error a secret. On information and belief, Defendant continued to fail to offer modification plans to Plaintiffs and members of the Class after discovering its automated calculation error. Defendant breached the duty of good faith and fair dealing it owed to Plaintiffs and members of the Class.

222.    Defendant discovered its "second" automated calculation error on or before April 30, 2018. While Defendant states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to the public until November 6, 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Class to suffer significant harm, Defendant has done nothing to mitigate the harm it caused to Plaintiffs and members of the Class. Defendant breached the duty of good faith and fair dealing it owed to Plaintiffs and members of the Class.

223.    Plaintiffs and members of the Class were injured by Defendant's breach of the Form Contract and suffered damages. In sending out Apology Letters to Plaintiffs and other Class members, Defendant admitted the breach; the only question that remains, therefore, is the amount of damages, which is to be proven at trial.

## SECOND CAUSE OF ACTION: BREACH OF THE FORM CONTRACT'S IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

224.    Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

225. The members of the Class entered into a contract with Defendant. The terms of the contract are set forth in the uniform borrower assistance form (the "Form Contract"). The Form Contract is a standard form document containing identical provisions as required by GSEs, HUD, and the HAMP.

226. Every contract, including the Form Contracts at issue in this case, includes and imposes upon each party to that contract a duty of good faith and fair dealing in its performance and enforcement.

227. Defendant agreed via the Form Contract to offer Plaintiffs and each member of the Class the best temporary payment plan or modification program for which they were eligible.

228. The Form Contract governs the relationship between Plaintiffs and members of the Class and Defendant with regard to temporary payment plan and modification programs pursuant to GSE, HUD, and HAMP requirements and incorporates by reference those GSE, HUD, and HAMP requirements. The Form Contract is signed by each member of the Class.

229. Plaintiffs and each member of the Class provided documents, information, and certifications in compliance with the Form Contract.

230. As a result, Defendant was, when necessary, required to consider Plaintiffs and each member of the Class for a loan modification. Plaintiffs and each member of the Class were eligible for a GSE, HUD, or HAMP temporary payment plan or loan modifications. But Defendant did not offer Plaintiffs or each member of the Class any temporary payment plan or loan modification. Defendant failed to do so because of a faulty automated calculation. Had that automated calculation been correct, Plaintiffs and each member of the Class would have been

approved for a trial modification. Defendant breached the implied covenant of good faith and fair dealing with Plaintiffs and each member of the Class under the Form Contract.

231.    Defendant's breach of the implied covenant of good faith and fair dealing impacted Plaintiffs and members of the Class at a time when they were experiencing extreme hardship.

232.    Moreover, Defendant continued to act even after and failed to disclose when it learned that it had made an automated calculation error that negatively affected the Class. Defendant discovered its "first" automated calculation error on or before October 2, 2015. While Defendant states that it fixed the first automated calculation error on October 2, 2015, it failed to disclose the error to the public until August 3, 2018 and failed to disclose the error to individuals it affected until September of 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Class to suffer significant harm, Defendant did nothing for almost three years to mitigate the harm.

233.    Defendant discovered its "second" automated calculation error on or before April 30, 2018. While Defendant states that it "implemented new controls" on April 30, 2018, it failed to disclose the error to the public until November 6, 2018. Despite admitting its error and that its error caused Plaintiffs and members of the Class to suffer significant harm, Defendant taken insufficient action to mitigate the harm it caused to Plaintiffs and members of the Class.

234.    Defendant breached the duty of good faith and fair dealing it owed to Plaintiffs and members of the Class by failing to maintain adequate procedures in support of its automated modification eligibility review programs.

235.    Plaintiffs and members of the Class were injured by Defendant's breach of the duty of good faith and fair dealing and suffered damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION: FRAUDULENT CONCEALMENT**

236.    Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

237.    Defendant misrepresented to Plaintiffs and members of the Class their eligibility for modification options. Moreover, Defendant actively and knowingly concealed for years its automated calculation errors. On information and belief, despite discovering those errors, Defendant continued to conduct foreclosures and issue notices of default regarding properties and consumers affected by those errors.

238.    Plaintiffs' and members of the Class's modification eligibility was of the utmost importance to Plaintiffs and members of the Class. Their eligibility for modification—as well as the automated errors erroneously determining them to be ineligible for modification—were material to Plaintiffs and members of the Class.

239.    Defendant was on notice since as early as 2010 of seriously deficient, unsafe, and unsound practices in its loan servicing, modification, and foreclosure programs. Despite committing in multiple consent cease and desist orders to do so, Defendant failed to adopt adequate controls, including necessary oversight, auditing, and testing procedures. In short, despite repeated reminders of its erroneous servicing, modification, and foreclosure practices and tools, Defendant elected to put profits and growth over compliance.

240.    By wrongfully communicating to Plaintiffs and members of the Class their purported ineligibility for loan modifications and by actively concealing from them, the public,

and government regulators known calculation tool errors and compliance deficiencies, Defendant intended to provoke reliance of Plaintiffs and members of the Class on Defendant's misrepresentations and omissions.

241.    Plaintiffs and members of the Class relied on Defendant's misrepresentations and omissions. That reliance was justified, particularly given that Defendant had in its power all of the tools necessary to determine eligibility for mortgage modification. Plaintiffs and members of the Class had neither the sophistication nor tools to check Defendant's misrepresentations and omissions regarding their mortgage modification eligibility and calculations.

242.    Defendant's conduct proximately caused Plaintiffs' and members of the Class injury, resulting in damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

243.    Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

244.    As alleged in this complaint, Defendant engaged in extreme and outrageous conduct. It repeatedly failed to oversee, audit, and test its servicing, modification, and foreclosure practices, including its automated calculation software. It then used that automated calculation software to make automated decisions about offering modifications and whether or not its customers could keep their family homes. As a result of repeated federal investigations, fines, and consent cease and desist orders, Defendant was on notice of its own deficient, unsafe, and unsound practices. Yet it allowed material errors in its software to persist for years, affecting hundreds of borrowers and causing the unnecessary foreclosure of hundreds of homes.

245.     And despite discovering its 2010-2015 automated calculation error no later than 2015, Defendant concealed its errors from government regulators and the public until 2018, when it was subjected to yet another consent cease and desist order. As the Federal Reserve determined, Defendant prioritized profits and growth over compliance.

246.     As a result of Defendant's long-term actions and inactions, Plaintiffs and the Class suffered severe emotional distress. Thus, contemporaneously with Defendant receiving billions in HAMP funds from the U.S. Government, Defendant systematically injured Plaintiffs and the Class through HAMP modification denials stemming from Defendant's reckless and heartless coverups and known and yet unmitigated errors.

247.     Defendant knew or should have known that by denying Plaintiffs and the other Class members a loan modification, its conduct would result in serious emotional distress to Plaintiffs and the other Class members, as the loss or potential loss of a home is an emotionally significant event.

248.     Defendant's reckless disregard for such emotional distress was beyond all possible bounds of decency and completely intolerable in a civilized community.

249.     The U.S. Government's creation of HAMP and other loan modification programs show that it intended for no person in a situation similar to Plaintiffs and the Class members to have to endure what Defendant forced Plaintiffs and the Class members to endure.

250.     Defendant's conduct was intentional and evidences a callous and reckless disregard for the rights of its customers and for the risk its actions posed to its customers.

251.     Defendant's intentional extreme and outrageous conduct proximately caused Plaintiffs' and members of the Class's emotional distress and damages, in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION: GROSS NEGLIGENCE AND/OR NEGLIGENCE**

252.     Plaintiffs incorporate by reference all other allegations of this Complaint as if fully restated herein.

253.     Defendant had an obligation to ensure that the information and statements it reported to credit reporting agencies was true and accurate. Defendant had a duty to Plaintiffs and the members of the Class to report fair, honest, and accurate information to the credit reporting agencies.

254.     Defendant made statements to the credit reporting agencies regarding the Plaintiffs' and members of the Class that were derogatory to their credit. The negative and derogatory information reported by Defendant to the credit reporting agencies was that the Plaintiffs and members of the Class had experienced a foreclosure or other negative event related to their mortgages.

255.     When Defendant made these negative and derogatory statements about Plaintiffs, it knew or should have known that the statements were false and/or inaccurate, based upon Defendant's own miscalculations.

256.     The reporting of a negative event related to a mortgage has a serious detrimental effect on credit. The reporting of a foreclosure is taken as an indication of poor creditworthiness. The reporting of a foreclosure or other negative event related to a mortgage reduces one's credit score between 85 to as much as 160 points.

257. Defendant's reporting of a negative event related to a mortgage against the Plaintiffs and members of the Class had a serious and detrimental effect upon their credit and the creditworthiness. Defendant's reporting of a negative event related to a mortgage against the Plaintiffs and members of the Class reduced their credit scores substantially.

258. The effect of Defendant's reporting of a negative event related to a mortgage against the Plaintiffs and members of the Class was not transitory. Upon information and belief, certain negative events related to a mortgage remain on a consumer's credit report for seven years. Defendant's reporting of a negative event related to a mortgage against the Plaintiffs and the members of the Class therefore resulted in long-term damage to their credit, creditworthiness, and credit scores.

259. Defendant's reporting of a negative event related to a mortgage regarding the Plaintiffs and the members of the Class was untrue or, in the least, requiring additional information so as to make the reporting of a negative event related to a mortgage not misleading. The communication of a negative event related to a mortgage created a false impression that would be contradicted by the inclusion of omitted facts.

260. Defendant concedes that the negative event related to a mortgage was not correct and that, at the least, Plaintiffs and members of the Class should have been approved for a trial modification that could have avoided a negative event related to a mortgage. Therefore, the reporting of a negative event related to a mortgage was false or at least gave a misleading impression that would have been contradicted by including the omitted facts of the circumstances of the negative event related to a mortgage.

261.     Defendant wrote to Plaintiffs and members of the Class as follows, showing the untrue and misleading nature of the reporting of a negative event related to a mortgage: "We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been." As set forth herein, Defendant admits it erred.

262.     Defendant's reporting of a negative event related to a mortgage was reckless, or at least negligent, at the time that it was made and, upon information and belief, the reporting of a negative event related to a mortgage was knowingly false not later than 2013. Yet, Defendant failed to take any action to correct its false statements and allowed reports of a negative event related to a mortgage that it knew to be false to tarnish the credit of the Plaintiffs and members of the Class for years.

263.     Upon information and belief, Defendant knew or should have known that there were flaws in its mortgage modification application software as early as 2011 and before the time it foreclosed upon or initiated other negative events related to a mortgage on the homes of Plaintiffs and members of the Class. Defendant thereby acted recklessly and maliciously.

264.     As set forth herein, the OCC and the Board of Governors of the Federal Reserve warned Defendant and its parent in 2011 that, inter alia, the Bank was engaged in "unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings." The Comptroller advised the Bank that it had failed to devote sufficient resources to the administration of its foreclosure processes, failed to perform adequate oversight, risk management, and audit of those processes, and failed to adequately oversee third-party vendors. The Comptroller, furthermore, specifically required the implementation of "processes to

ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the underlying mortgage note" and applicable legal requirements. Therefore, by the time of the negative event related to a mortgage of the homes of Plaintiffs and members of the Class, Defendant was on notice to correct deficiencies with respect to the calculation of fees charged to borrowers and its failure to do so was reckless and therefore malicious.

265. Furthermore, upon information and belief, Defendant knew that there were flaws in its mortgage modification application software as early as 2013, which specifically resulted in the sort of erroneous denials of modifications at issue in this case. As set forth herein, Defendant's internal documents show that the software error resulting in claims herein was reported to Defendant and known within the organization no later than 2013. Upon information and belief, Defendant therefore knew or should have known that it had wrongly denied applications for mortgage modifications by that time.

266. Once Defendant knew or should have known that it had wrongly denied applications for mortgage modifications, Defendant's report of the Plaintiffs' and members of the Class's negative events related to a mortgage to credit reporting agencies was not only recklessly untrue, but willfully so. At that point, Defendant was required to disclose information or to make corrective statements in order to make the previous statements that the Plaintiffs and members of the Class had been subject to negative events related to a mortgage not misleading.

267. Therefore, Defendant's statements to credit reporting agencies with respect to the negative event related to a mortgage of the Plaintiffs and members of the Class were both recklessly malicious at the time they were made, and willfully malicious once Defendant knew or should have known that it had wrongly denied applications for mortgage modifications.

Defendant's report that the Plaintiffs and members of the Class had experienced negative events related to a mortgage was thus a communication made with malicious and/or willful intent not subject to preemption by the Fair Credit Reporting Act.

268.     Further, Defendant willfully, or at least recklessly, failed to correct its statements regarding the Plaintiffs and members of the Class, and to correct the wrong information that it had provided to the credit reporting agencies. It did this with the knowledge of the serious impacts this inaction would have on the Plaintiffs and members of the Class.

269.     The Plaintiffs and members of the Class were left to deal with a negative event related to a mortgage on their credit report and that they would have to explain to future mortgage lenders for the rest of their lives, because they were not offered a mortgage modification due to Defendant's misconduct, a serious derogatory credit item which caused the Plaintiffs and members of the Class damage.

270.     As a result of Defendant's statements affecting their credit, Plaintiffs and members of the Class suffered damages in an amount subject to proof, including loss of time and money spent in an efforts to repair their credit; loss of favorable interest rates or other favorable loan terms; damage to credit; opportunity costs due to damaged credit or higher costs of borrowing.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant Wells Fargo Bank, N.A. as follows:

A. For an Order Certifying the Class, appointing Plaintiffs as Representatives of the Class and Plaintiffs' counsel as Class Counsel;

B. For entry of judgment in favor of Plaintiffs and members of the Class against Defendant for damages in an amount to be proven at trial, including statutory, treble and/or punitive damages in accordance with applicable law.

C. For entry of judgment in favor of Plaintiffs and members of the Class against Defendant for reasonable attorneys' fees and costs.

D. For entry of judgment in favor of Plaintiffs and members of the Class for pre-judgment interest on all damages; and

E. For such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Respectfully submitted,

By: */s/ Marc E. Dann*
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
**DannLaw**
15000 Madison Avenue
Lakewood, OH 44107
Office: (216) 373-0539
Facsimile: (216) 373-0536
Email: notices@dannlaw.com

Christopher D. Stock (0075443)
Terence R. Coates (0085579)
**MARKOVITS, STOCK & DEMARCO, LLC**
3825 Edwards Rd., Suite 650
Cincinnati, Ohio 45209
Telephone: (513) 651-3700
Facsimile: (513) 665-0219

Email: cstock@msdlegal.com
Email: tcoates@msdlegal.com

Gretchen Freeman Cappio*
Adele A. Daniel
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: gcappio@kellerrohrback.com
Email: adaniel@kellerrohrback.com

Alison E. Chase*
Matthew J. Preusch
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497
Email: achase@kellerorhback.com
Email: mpreusch@kellerrohrback.com

Richard M. Paul III*
Laura C. Fellows*
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Email: Rick@PaulLLP.com
Email: Laura@PaulLLP.com

Michael L. Schrag*
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
Email: mls@classlawgroup.com

*Pro hac vice forthcoming*
*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2021, a true and accurate copy of the foregoing Plaintiffs'

Third Amended Complaint was filed electronically and served upon all parties via the Court's

CM/ECF system.

/s/*Marc E. Dann, Esq.*
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
DannLaw
*Co-Counsel for Plaintiffs and the Putative Class*