| | |
|---|---|
| **ETHAN RYDER et al.,**<br>*on behalf of themselves and all others similarly situated,*<br><br>       Plaintiffs,<br><br> v.<br><br>**WELLS FARGO BANK, N.A.**<br><br>       Defendant. | Case No.1:19-CV-638<br><br>Judge Timothy S. Black<br>Magistrate Judge Karen L. Litkovitz |

## PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs and proposed Class Representatives Ethan Ryder, James Chambers, Maureen Mann, Viola Thomas, Kimberly Duncan, and Jose Aguilar and Elizabeth Manley ("Class Representatives" or "Named Plaintiffs"),[1] on behalf of themselves and the proposed Settlement Class, respectfully move this Court to enter the proposed Order Granting Preliminary Approval of Class Action Settlement ("Preliminary Approval Order"), filed contemporaneously with this Motion. The Parties reached the proposed settlement after multi-front litigation and extensive arm's length negotiations, including two day-long mediation sessions with Retired U.S. Magistrate Judge Morton Denlow. As set forth in the accompanying memorandum of law, the proposed Class Representatives respectfully request the Court grant the motion and direct notice be sent to Class Members.

---

[1] Capitalized terms not defined herein are as stated in the Class Action Settlement Agreement and Release finalized and signed by all Parties no later than June 3, 2021, attached as Exhibit 1 to the Declaration of Marc E. Dann ("Dann Decl.") in support of this Motion and Memorandum.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

## I.  INTRODUCTION

Class Representatives seek preliminary approval of a proposed $12 million class action settlement providing monetary relief to borrowers impacted by defendant Wells Fargo Bank, N.A.'s ("Wells Fargo" or the "Bank") failure to offer them trial mortgage modifications due to a calculation error in the software utilized by Wells Fargo to assess their eligibility for a trial mortgage modification plan. The nationwide relief negotiated under the supervision of U.S. Magistrate Judge Morton Denlow (Ret.), after over a year of multi-front litigation, would end this litigation on terms that are fair, reasonable, and adequate.

The Parties reached this proposed Settlement only after the Parties sufficiently understood the strengths and weaknesses of their respective positions. Importantly, no claim form will be required from Class Members for these payments. Under the proposed Settlement, Wells Fargo will pay $12 million, including over $9 million in non-reversionary direct cash payments to Class Members. Under the proposed allocation plan, the approximately 1,830 Class Members would each receive between $1,000 and $19,000, depending on specifically negotiated factors relating to their loan status following the erroneous trial modification denial. The $12 million fund will also cover any court-approved administration expenses, costs, and attorney fees.

The Parties have agreed to a robust notice program and a settlement administration process that will provide the proposed Class Members with monetary relief in an expedited manner. The Class Action Administrator will provide direct mail notice to the most updated, known addresses of Class Members, and if the direct mail is returned as undeliverable, the Class Action Administrator will then undertake industry-tested steps to locate an alternative address

and resend the notice. There is no reversion of unclaimed Class Member funds; instead, any unclaimed funds will be allocated *cy pres* to NeighborWorks America, a Congressionally-chartered nonprofit organization supporting community development with a nationwide reach, mirroring the composition of the Settlement Class.

The proposed Settlement compares favorably to other class action settlements for alleged wrongful trial loan modification denials and provides real relief to Class Members. Given the Settlement's many strengths, balanced against the risks of continued litigation, the proposed Class Representatives respectfully request that the Court grant preliminary approval to the proposed Settlement, certify the Settlement Class, and direct notice to the Class Members.

## II. FACTUAL BACKGROUND

### A. The Alleged Circumstances that Prompted This Lawsuit

Class Representatives allege that Wells Fargo wrongfully denied trial loan modifications to approximately 3,000 homeowners due to a calculation "error" within the software it used to process trial loan modifications. Third Amended Complaint ("TAC"), Doc. 42, PageID# 737, ¶¶ 2-12. Wells Fargo admits that this calculation error occurred. (*Id.*, PageID# 736-37, ¶¶ 4-7) From approximately 2010 to 2018, this calculation error in Wells Fargo's software overstated the amount of attorney's fees used when calculating borrowers' eligibility for a trial loan modification under the federal Home Affordable Modification Program (HAMP). (*Id.*, PageID# 753, ¶ 78) Rather than limit such fees to the maximum allowable under HAMP, the Bank added the limits to fees actually incurred, and consequently, certain homeowners who should have qualified for trial modifications were deemed unqualified for such financial assistance. (*Id.*)

Following the erroneous trial modification denial, some borrowers lost their homes to foreclosure by Wells Fargo; some borrowers sold their homes in a short sale, while others saw the servicing rights to their mortgages transferred to other companies. Other borrowers were able

to obtain subsequent mortgage loan modifications, pay off their mortgages, or otherwise remain active borrowers with Wells Fargo. These categories of harm are summarized below, *infra* Section III(C)(1). This case is brought on behalf of the approximately 1,830 homeowners whose homes were not sold by Wells Fargo in foreclosure.[2]

Wells Fargo discovered the error in 2013 and implemented a partial fix in 2015. (*Id.*, PageID# 748, 750 ¶¶ 59, 68) A related error, however, continued until 2018. (*Id.*, PageID# 753, ¶ 78) That same year, Wells Fargo publicly admitted the error and implemented a comprehensive fix. (*Id.*) The Bank eventually sent affected homeowners a letter belatedly apologizing for its mistake, and it provided compensation, typically between $5,000 and $15,000, to some of these homeowners. (*See id.*, PageID# 751, ¶¶ 71-74) The letters also invited borrowers to mediate legal disputes. (*Id.*, PageID# 751, ¶ 74) Many borrowers pursued mediation, but did not feel that Wells Fargo made them whole through that process.

### B. Procedural Background

Several putative class actions followed Wells Fargo's disclosure. Certain of proposed Class Counsel in this case filed the *Hernandez* case in December 2018. Named Plaintiff Ryder filed this case in August 2019. Other plaintiffs, including Named Plaintiffs Maureen Mann, Viola Thomas and John Chambers, reached tolling agreements with Wells Fargo and had not yet initiated litigation prior to settlement for that reason.

In the present action, several of the Named Plaintiffs and Wells Fargo engaged in motion practice. Soon after Named Plaintiff Ryder filed his Motion for Leave to File an Amended Complaint (Doc. 30), counsel for Wells Fargo reached out to discuss the possibility of mediation.

---

[2] The claims of borrowers subject to the same error but whose homes Wells Fargo sold in foreclosure are being resolved in the class settlement in *Hernandez v. Wells Fargo Bank, N.A.*, Case No. 3:18-cv-7354-WHA (N.D. Cal.).

The Parties agreed to mediation in front of Magistrate Judge Morton Denlow (Ret.). Further motion practice was stayed when the Parties notified the Court of a fruitful first mediation, and by the Parties' commitment to attempt to resolve the disputes through mediation rather than continued litigation.

Plaintiff Aguilar is a co-plaintiff in a proposed class action (of which Plaintiff Manley is a member) against Wells Fargo captioned *William Liguori, Jr., et al. v. Wells Fargo Bank, N.A.,* Case No. 7:19-cv-10677, pending in the United States District Court for the Southern District of New York.[3]  In this matter, the parties fully briefed a Motion to Dismiss. On September 8, 2020, that court granted Wells Fargo's Motion to Stay the *Ligouri* proceedings due to the pending Final Approval of the *Hernandez* settlement and denied Wells Fargo's Motion to Dismiss without prejudice. Since the stay was ordered, the parties have filed periodic updates with that court informing it of the progress of the settlement discussions in this matter.

In the *Duncan* matter, the parties engaged in one full day of mediation as well as significant Motion practice, including Wells Fargo's filing of a Motion to Dismiss, Plaintiff Duncan's filing of a First Amended Complaint, and Wells Fargo's filing of a renewed Motion to Dismiss of the First Amended Complaint. Wells Fargo's Motion to Dismiss was stayed by the Court on March 10, 2020. Since that time, the parties have filed periodic updates with the Court informing it of the progress of the settlement discussions in this matter.

As of the filing of this Motion, Plaintiff Chambers did not have any active litigation on-going against Wells Fargo over the software error. Plaintiff Chambers received his Apology Letter from Wells Fargo in November 2019. After some diligence (in which he familiarized himself with both this matter and the *Hernandez* matter), Plaintiff Chambers retained Proposed

---

[3] In the *Ligouri* matter, co-Plaintiffs William Liguori, Jr. and Tricia Liguori were determined to be a part of the *Hernandez* class and did not opt out of the *Hernandez* settlement.

Class Counsel here (DannLaw) prior to the first mediation session in this case. Plaintiff Chambers was actively involved during both mediation sessions.

Plaintiff Mann received an apology letter from Wells Fargo in approximately November 2019 after she lost her home by short sale. Plaintiff Mann was represented by counsel in *Hernandez* as a putative class member, provided helpful documents and information, and has been tracking the litigation's progress. After class certification was granted in part in *Hernandez* for those borrowers who lost their homes to foreclosure but denied in part for non-foreclosed borrowers, Plaintiff Mann continued to be involved with Class Counsel and was actively involved in both mediation sessions. She has also remained involved in the case to monitor its progression on behalf of the other putative class members.

As of the filing of this Motion, Plaintiff Thomas did not have any active litigation pending against Wells Fargo over the software error. Plaintiff Thomas received and apology letter from Wells Fargo dated June 17, 2019 after losing her home by short sale in February of 2012. After conducting her own research on the matter, Plaintiff Thomas retained Class Counsel (Keller Rohrback) in October of 2020 just before the first mediation session between Plaintiffs and Wells Fargo and was actively involved in preparation for and following that session. She has remained involved in the case to monitor its progression on behalf of the other putative class members.

In anticipation of their mediation with Judge Denlow, the Parties submitted detailed mediation statements addressing key liability and damages issues, and also engaged in substantive back-and-forth discussions to narrow their positions. Borrowers fall into five categories, including: Short Sale; Service Transfer; Paid in Full; Active; and Sub-Modification. These categories are all described in the Settlement Allocation discussion, Section III(C)(1)

below, and while liability issues are the same for each, the categories are relevant to alleged damages and thus impacted settlement allocation.[4]

Negotiations were lengthy and thorough. The Parties' first mediation was a roughly 13-hour virtual session with Magistrate Judge Denlow on October 8, 2020. After this mediation session, the Parties engaged in an ongoing informal exchange of information, and Wells Fargo informed Plaintiffs about over 1,000 additional borrowers who could be considered part of the class. On March 23, 2021, the parties engaged in a second full day of virtual mediation, for nearly 12 hours. At the end of that second day, the Parties agreed in principle to a $12 million settlement, $9,098,907 of which will be distributed to 1,830 class members, without a claims process and without reversion. Class members will receive settlement benefits ranging from $1,000 to $19,000 depending on their category. Additionally, Wells Fargo will separately pay, subject to Court approval, $2,719,093 in attorneys' fees, litigation costs, service awards, and settlement administration expenses.

On June 3, 2021, the Parties finally executed the formal settlement agreement now before the Court. Wells Fargo, with Class Counsel's approval, retained an experienced settlement administrator, JND Legal Administration, after soliciting multiple bids. (Dann. Decl. ¶16) With JND's help, the Parties developed a notice and funds distribution plan. (*Id.* at ¶ 18)

### III. TERMS OF PROPOSED SETTLEMENT

**A.      Proposed Settlement Class**

The Settlement would offer relief to the following proposed Settlement Class:

> All persons, in the United States who between 2010 and 2018 (i) qualified for a home loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), the U.S. Department of Treasury's Home

---

[4] The bases for each of these subcategories are described in more detail below.

Affordable Modification Program (HAMP); (ii) were not offered a home loan modification or repayment plan by Wells Fargo due to excessive attorney's fees being included in the loan modification decisioning process; and (iii) whose home Wells Fargo did not sell in foreclosure.; and (iv) are reflected Settlement Class List [as defined in the Settlement Agreement].

(Settlement Agreement, Ex. 1 to Dann Decl. ("Settlement Agreement") at § II(32)) Excluded from the Settlement Class are: (a) Wells Fargo and its principals, affiliated entities, legal representatives, successors, and assigns; (b) any Person who files a valid, timely Request for Exclusion; (c) federal, state, and local governments (including all agencies and subdivisions thereof); and (d) any Person who settled and released claims at issue in this Action. (*Id.*)

**B. Settlement Fund**

The proposed Settlement provides a $12 million settlement fund. (Settlement at § II(35), V(B), XI(A), (C).) The $9,098,907 in Class Member payments is non-reversionary and will be paid automatically, without any claims process, and directly to Class Members. Separately, subject to Court approval, Wells Fargo has agreed to pay $2,719,093 in attorneys' fees and up to $100,000 in administration costs, $65,000 in litigation expenses, and $17,000 in Class Representative service awards. Wells Fargo would retain any fees, costs or service awards not awarded.

There is no claims process because the Class Members are known and because the amount of monetary payments to Class Members can be fairly determined based on the information known to Wells Fargo and/or Class Counsel, as discussed below. As such, upon final approval and after the deadline for any appeals passes, JND would mail checks to Class Members and follow-up with them if checks are not deposited. If the checks remain undeposited after 120 days, then the Settlement Agreement provides that NeighborWorks America, a

Congressionally-chartered, nonpartisan, charitable organization focused on affordable housing, receives any residual sums. (Settlement, V(B)).  Funds do not revert to Wells Fargo.

### C.  Settlement Allocation

#### 1.  Class Member Benefits

The Settlement Agreement contains a plan of allocation. The allocation plan contemplates fixed settlement payment amounts according to five categories: Short Sale, Service Transfer, Paid in Full, Active, and Subsequent Modification ("Sub-Modification"). The following table describes each category and the payments members of that category would receive under the allocation plan.

| Category | Description | Allocation |
|---|---|---|
| Short Sale | Class Member sold his or her property in a short sale. | $19,000 per loan for Short Sale Class Member, in addition to any sums already received separately in remediation from Wells Fargo. |
| Service Transfer: Service Transfer—Foreclosed and Service Transfer—Not Foreclosed | Service and management of the Class Member's mortgage and loan were transferred from Wells Fargo to another entity. Some of these Class Members were subsequently foreclosed upon, but are not members of the *Hernandez* Class because their homes were not foreclosed by Wells Fargo. | Service Transfer—Foreclosed: $13,000 per loan for Service Transfer Class Member whose home was subsequently foreclosed upon, though not by Wells Fargo, in addition to any sums received separately from Wells Fargo.<br><br>Service Transfer—Not Foreclosed: For Service Transfer Class Members whose properties were not foreclosed upon, the Allocation plan provides a $5,000 payment per loan in addition to any sums already received separately from Wells Fargo. |
| Paid in Full | Class Members who have paid off their mortgage. | $5,000 per loan for Paid in Full Class Members, in addition to any sums already received separately from Wells Fargo. |
| Active | Class Members who are still actively paying on their mortgages. | $4,000 per loan for Active Class Members, in addition to any sums already received separately from Wells Fargo. |

| Sub-Modification | Class Members who were initially denied a trial modification due to Wells Fargo's error, but whose error was subsequently fixed and who were provided a modification. | $1,000 per loan for Sub-Modification Class Members, in addition to any sums already received separately from Wells Fargo. |
|---|---|---|

Because the "Short Sale" and "Service Transfer—Foreclosed" categories represent categories of Class Members who lost their homes (through one avenue or another), the allocated amounts are greater than the other categories.

### 2. *Cy Pres* Distribution

Funds remaining from the $9,098,907 in Class Member payments (opt-out amounts and uncashed checks) will be awarded to a *cy pres* recipient. The Parties propose NeighborWorks America, a Congressionally-chartered, nonpartisan, charitable organization focused on affordable housing. (Settlement at § V.B.)

### D. Settlement Administration & Notice

The Settlement provides that a Class Action Administrator will administer the notice plan and distribute the net settlement fund in accordance with the Settlement and the Court's orders. (Settlement at § II(5), VII) Wells Fargo solicited bids from a list of multiple qualified administrators. JND's bid was the most cost effective; it agreed to provide settlement administration services for no more than $100,000. (Dann Decl., ¶ 16.) Markovits, Stock & DeMarco, the Gibbs Law Group, Paul LLP, and Keller Rohrback, L.L.P. have worked favorably with JND in the past. (*Id*. at ¶ 17.)

Together, the Parties and JND developed a robust "Notice Program" that uses all available data and tools to provide notice to all members of the Class. *See id.* at ¶ 18. JND will send notice via first-class mail using updated names and addresses for each Class Member provided by Wells Fargo. (Settlement, VII(A).) JND will initially perform a National Change of

Address search or search similar databases to obtain a current address. (*Id.*) For Class Members whose notices are returned as undeliverable, JND will update addresses and promptly resend notices. Similarly, JND will update its database with any notices that are forwarded by the post office to addresses that have recently changed. (Keough Decl. at ¶¶ 16-17.)

The Class Notice clearly explains the material aspects of the Settlement, as well as how to opt out of or object to the Settlement. (Proposed Notice, Ex. B to Settlement Agreement) The Notice will identify a dedicated Settlement Website with links to important case documents as well as a Spanish translation of the Notice. Class Members will have 45 days from the date of initial mailing of the Notice to opt out of or object to the Settlement. The Notice will direct Class Members to submit opt-out requests to JND, who will promptly forward copies to the Parties. The Notice will also instruct Class Members who wish to object to the Settlement to submit their objections to the Court and to counsel for the Parties in this case, and will detail what information must be provided. After the deadline for opt-outs and objections, JND will prepare a report for the Court and the Parties summarizing all requests for exclusion.[5]

### E. The Settlement Includes a Proportional Release.

In exchange for the benefits provided under the Settlement, Class Members will provide a release of claims against Wells Fargo and all of its respective predecessors, successors, assigns, parents, subsidiaries, divisions, departments, and affiliates, and all past, present, and future officers, directors, employees, stockholders, partners, agents, servants, successors, attorneys, insurers, representatives, licensees, licensors, customers, subrogees, and assigns, limited to any and all claims, rights, causes of action, liabilities, actions, suits, damages, or demands of any kind whatsoever, known or unknown, that arise out or are based on any of the claims that were asserted, or could have been asserted based on the subject loan modification denials, any failure

---

[5] JND will provide notice of the proposed settlement under CAFA. (Keough Decl. at ¶ 12.)

to modify the loans, any subsequent modifications, and any short sales or other dispositions of the subject properties, including any and all claims for damages, injunctive relief, interest, attorneys' fees, and litigation expenses.[6] (Settlement at §II(28).) In turn, Wells Fargo will release Class Members from any claims related to this litigation or settlement. (*Id.*)

## IV. LEGAL STANDARD

Settlement of class actions is generally favored and encouraged. *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981). Federal Rule of Civil Procedure ("Rule") 23(e) provides three steps for the approval of a proposed class action settlement: (1) the Court must preliminarily approve the proposed settlement; (2) members of the class must be given notice of the proposed settlement; and (3) a fairness hearing must be held, after which the court must determine whether the proposed settlement is fair, reasonable, and adequate. *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 372 (S.D. Ohio 2006); *see also Amos v. PPG Indus.*, No. 2:05-cv-70, 2015 WL 4881459, at *1 (S.D. Ohio Aug. 13, 2015) (same). Class Representatives request that the Court preliminarily approve the proposed settlement, the first step in the three-step process.

At this step, the Court's task is to determine whether "giving notice is justified by the parties' showing that the court will likely be able to" grant final approval to the settlement and certify the proposed class. Fed. R. Civ. P. 23(e)(1)(B); *see also* Fed. R. Civ. P. 23(e)(1), advisory committee's note to 2018 amendments ("The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to

---

[6] Given the quality of Class Member contact information, the small class size, and the substantial compensation to all Class Members, it is unlikely in these circumstances that Class Members who do not opt out will not follow through with the ministerial task of depositing checks. The release thus extends to Class Members who do not opt out but fail to accept payment.

object."). Revised Rule 23 provides a checklist of seven factors to consider when assessing whether a proposed settlement is fair, reasonable, and adequate for the purposes of final approval. *See* Fed. R. Civ. P. 23(e)(2). These are: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest. *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).

At preliminary approval, courts are not required to "make an affirmative determination of each factor but, rather, should grant preliminary approval if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with the range of possible approval.'" *Bailey v. Verso Corp.*, No. 3:17-CV-332, 2021 WL 673164, at *3 (S.D. Ohio Feb. 22, 2021) (quoting *Ostendorf v. Grange Indem. Ins. Co.*, No. 2:19-cv-1147, 2020 WL 5366380, at *2 (S.D. Ohio Sept. 8, 2020)); *see also Bautista v. Twin Lakes Farms, Inc.*, No. 104-CV-483, 2007 WL 329162, at *4 (W.D. Mich. Jan. 31, 2007) ("The court's role in reviewing settlements must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between the negotiating parties, and that the settlement taken as a whole is fair, reasonable, and adequate to all concerned.") (internal quotes omitted).

The Court must preliminarily determine that the settlement is sufficiently fair, reasonable, and adequate so that it can "direct the preparation of notice of certification, proposed settlement, and date of the final fairness hearing" to all those affected by it. *In re Skechers Toning Shoe*

*Prods. Liab. Litig.*, No. 3:11-MD-2308-TBR, 2012 WL 3312668, at *7 (W.D. Ky. Aug. 13, 2012); *see also In re Prandin Direct Purchaser Antitrust Litig.*, No. 2:10-CV-12141-AC-DAS, 2014 WL 8335997, at *3 (E.D. Mich. Oct. 2, 2014) ("The ultimate approval of a class action settlement requires a finding that the settlement is fair, adequate, and reasonable."); *Brotherton v. Cleveland*, 141 F. Supp. 2d 894 (S.D. Ohio 2001); *In re S. Ohio Corr. Facility*, 173 F.R.D. 205, 211 (S.D. Ohio 1997).

## V. ARGUMENT

**A.      Certification of the proposed class for purposes of settlement is appropriate.**

The Supreme Court has recognized that the benefits of a proposed settlement of a class action can be realized only through the certification of a settlement class. *See Amchem Prods. v. Windsor*, 521 U.S 591, 620 (1997). Accordingly, Class Representatives seek the conditional certification of the Settlement Class set forth above and in the Agreement.

For the Court to certify a class, the plaintiffs must satisfy all of the requirements of Rule 23(a), and one of the requirements of Rule 23(b). *See Pelzer v. Vassalle*, 655 F. App'x 352, 363 (6th Cir. 2016). The four requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy. Furthermore, Class Representatives seek certification of the Settlement Class under Rule 23(b)(3), which provides that certification is appropriate where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members [predominance], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [superiority]." Fed. R. Civ. P. 23(b)(3).

As discussed below, these requirements are met for purposes of settlement in this case.

**1.   Numerosity**

The numerosity requirement under Rule 23(a)(1) is satisfied where the class is so numerous that joinder of all Class Members is impracticable. Fed. R. Civ. P. 23(a)(1). There is no magic number needed to satisfy numerosity; in the Sixth Circuit, numerosity has been satisfied with a class of 35. *See In re Am. Med. Sys. Inc.*, 75 F.3d 1069, 1076 (6th Cir. 1996) ("the Sixth Circuit has previously held that a class of 35 was sufficient to meet the numerosity requirement" (internal quotation marks omitted)); *see also Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006) ("substantial" numbers satisfy, and thousands are "substantial"). Here, the 1,830 Class Members more than satisfy this element. (Settlement, App'x A.)

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has stated that Rule 23(a)(2)'s commonality requirement is satisfied where the plaintiffs assert claims that "depend upon a common contention" that is "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011). Both the majority and dissenting opinions in that case agreed that "for purposes of Rule 23(a)(2) even a single common question will do." *Id.* (Internal quotation marks and citation omitted).

In this case, there are numerous common questions of law and fact, including:

- Whether the calculation error led to the denial of trial loan modifications to the Class Members and Wells Fargo's knowledge of the error;

- Wells Fargo's policies and practices regarding audit, verification, and management of its automated mortgage modification decisioning software and diligence with respect to same;

- Interpretation of the uniform contracts at issue here, including whether uniform contracts required notice of loan modifications as an option to cure a default, which is answerable through common proof;

- Whether Wells Fargo concealed the error or engaged in misrepresentation concerning the error to Class Members and others; and

- Reporting to credit agencies and related questions, including Wells Fargo's efforts to correct inaccurate credit reporting.

Plaintiffs in this case have more than satisfied this element.

### 3. Typicality

To satisfy the typicality requirement of Rule 23(a)(3), the claims or defenses of the representative parties must be typical of the claims or defenses of the class. "The typicality requirement ensures that the representative's interests will be aligned with those of the represented group and that the named plaintiff will also advance the interests of the class members." *Chesher v. Neyer*, 215 F.R.D. 544, 549 (S.D. Ohio 2003). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Id.*; *see also Am. Med. Sys.*, 75 F.3d at 1082 (same). Typicality seeks to ensure that there are no conflicts between the class representatives' claims and the claims of the Class Members represented.

Here, all the Class Representatives' claims arise out of the same alleged conduct; Wells Fargo's alleged failure to correct known errors in its modification eligibility software. And the claims of the Plaintiffs and Class Members arising from this conduct are all based on the same legal theories, such as breach of contract. Typicality is satisfied.

### 4. Adequacy of Representation

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). There are two criteria: 1) the "representative must have common interests with unnamed members of the class," and 2) "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Am. Med. Sys.*, 75 F.3d at 1083 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).

Here, the Class Representatives are adequate because they have actively sought to recover on behalf of themselves and others against Wells Fargo, and they have actively participated in the litigation of this case. Mr. Ryder personally attended the first mediation session with Magistrate Judge Denlow and was in regular communications with Class Counsel during the second mediation session. Mr. Aguilar and Ms. Manley actively engaged in ongoing litigation in New York, including participating in discovery as well as regular communications during the initial October 2020 mediation session. Mr. Chambers also actively participated by phone during the October 2020 mediation session and in the period of time between the first and mediation. Ms. Mann and Ms. Thomas have been actively engaged and in regular communications with Class Counsel. The Class Representatives will continue to vigorously prosecute this litigation on behalf of the Class.

In addition, Class Counsel are qualified to litigate and settle class-action claims pertaining to mortgage issues. The Agreement designates Markovits, Stock & DeMarco, LLC, DannLaw, the Gibbs Law Firm, Paul LLP, and Keller Rohrback L.L.P as Class Counsel. These firms have collectively invested considerable time and resources into the prosecution of this action. Class Counsel possess a wealth of experience litigating complex class action lawsuits,

and were able to negotiate an outstanding settlement for the Class Members. (*See* Dann Decl. ¶¶ 7, 15.) Based on the results achieved here, the Court should appoint these firms as Class Counsel, and determine that Rule 23(a)'s adequacy requirement is satisfied.

### 5. Rule 23(b)(3) Requirements

Class Representatives seek to certify a Class under Rule 23(b)(3), which has two components: predominance and superiority. "The Rule 23(b)(3) predominance requirement parallels the Rule 23(a)(2) commonality requirement in 'that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues.'" *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352, at *6 (W.D. Ky. Dec. 22, 2009) (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1084 (6th Cir. 1996)). When assessing predominance and superiority, the court may consider that the class will be certified for settlement purposes only, and that a showing of manageability at trial is not required. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").

With respect to predominance, the Sixth Circuit has explained that "named plaintiffs must show, and district courts must find, that questions of law or fact common to members of the class predominate over any questions that affect only individual members." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 860 (6th Cir. 2013). With respect to superiority, the court considers whether a class action is "superior to other methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) provides a non-exhaustive list of factors to be considered when making this determination. These

factors include: (i) the class members' interests in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by or against class members; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the likely difficulties in managing a class action. *Willis v. Big Lots, Inc.*, No. 2:12-CV-604, 2017 WL 1063479, at *2 (S.D. Ohio Mar. 17, 2017) (citing Fed. R. Civ. P. 23(b)(3)).

Here, there are several common questions of law and fact that predominate over any questions that may affect individual Class Members. Wells Fargo engaged in a uniform course of conduct applicable to all Class Members, including the foundational allegation that Wells Fargo failed to offer trial loan modifications because of a widespread software error that miscalculated Class Members' eligibility for monetary relief pursuant to HAMP. This central liability issue is subject to generalized proof, and it is a question that is common to all Class Members. *See, e.g.*, *In re Countrywide*, 2009 WL 5184352, at *6 ("the proof required [must focus] on Defendant's conduct, not on the conduct of the individual class members"). This also renders the proposed settlement Class sufficiently cohesive. Accordingly, the predominance prong of Rule 23(b)(3) is satisfied.

The second prong of Rule 23(b)(3)—that a class action is superior to other available methods for the fair and efficient adjudication of the controversy—is also readily satisfied. *See* Fed. R. Civ. P. 23(b)(3). The Agreement provides members of the Settlement Class with quick, simple, and certain relief, and contains well-defined administrative procedures to ensure due process. This includes the right of any Class Member who is dissatisfied with the settlement to object to it or to request exclusion from the Class. Moreover, the cost of litigating each Class Member's case on an individual basis would be substantial for each Class member; the most

reasonable and economically feasible method of litigating and resolving these hundreds of claims is through the class device. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." (internal quotations omitted)). Here, individual trials are not feasible; the proposed class action remedy is superior.

In sum, because the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied, certification of the proposed Class is appropriate.

### 6. The Court should appoint the proposed Class Representatives, Class Counsel, and Class Action Administrator.

Named Plaintiffs Ethan Ryder, James Chambers, Maureen Mann, Viola Thomas, Kimberly Duncan, and Jose Aguilar and Elizabeth Manley, seek to be appointed as Class Representatives for the Settlement Class. Most of the Named Plaintiffs have been involved in the prosecution of cases against Wells Fargo on these common claims for more than a year. They have cooperated with counsel and assisted in the preparation of Complaints. They are committed to continuing to vigorously prosecute this case, including overseeing the notice program, and defending the Settlement Agreement against any objectors, all the way through the Court's final approval. Their claims are typical of the claims of the Settlement Class, and they will fairly and adequately protect the interests of the Settlement Class. *See* Rule 23(a)(3) and (4). The Named Plaintiffs therefore ask the Court to appoint them as class representatives.

Second, for the reasons previously discussed with respect to adequacy of representation, the Court should designate the law firms of Markovits, Stock & DeMarco, LLC, DannLaw, The Gibbs Law Firm, Paul LLP, and Keller Rohrback L.L.P., as Class Counsel.

Finally, Wells Fargo, with the approval of proposed Class Counsel, has proposed that JND Legal Administration act as Class Action Administrator. JND and its principals have a long history of successful settlement administrations in class actions. (Keough Decl.¶¶ 2,7-8.) The Court should appoint JND as Class Action Administrator here.

### 7. The proposed form and manner of notice to the Class is reasonable and should be approved.

Under Rule 23(e), the Court must "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement. Fed. R. Civ. P. 23(e)(1). Notice of a proposed settlement to class members must be the "best notice practicable." Fed. R. Civ. P. 23(c)(2)(B). "[B]est notice practicable" means "individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S. Ct. 2140, 2150, 40 L. Ed. 2d 732 (1974). To satisfy these standards and "comport with the requirements of due process, notice must be 'reasonably calculated to reach interested parties.'" *In re Countrywide*, 2009 WL 5184352, at *12 (quoting *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008)).

The Notice Plan set forth in the Agreement provides the best notice practicable under the circumstances. The Parties negotiated the form of the Settlement Notice with the aid of a professional notice provider, JND. That Settlement Notice will be disseminated to all persons who fall within the definition of the Class and whose names and addresses can be identified with reasonable effort from Wells Fargo's records, and through databases tracking nationwide addresses and address changes. In addition, JND will administer a settlement website containing important and up-to-date information about the settlement (Keough Decl. ¶¶ 18-21.) The Settlement Notice is attached as Exhibit B to the Settlement Agreement.

In addition, Rule 23(h)(1) requires that "[n]otice of the motion [for attorneys' fees] must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner."[7] Here, the proposed Notice Plan satisfies the requirements of Rule 23(h)(1), as it notifies Class Members that Class Counsel will apply to the Court for attorneys' fees of no more than $2,719,093, or less than 25% of the fund created by Wells Fargo, plus reimbursement of litigation expenses. This proposed fee amount is well within the range of reasonable attorneys' fees awarded for similar class action matters in the Sixth Circuit as well as other federal district courts. *See, e.g.*, *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F. Supp. 148, 150 (S.D. Ohio 1986) ("typically the percentages range from 20% - 50%"); *Manners v. Am. Gen. Life Ins. Co.*, No. Civ. A. 3-98-0266, 1999 WL 33581944, at *29 (M.D. Tenn. Aug. 11, 1999) ("[T]hroughout the Sixth Circuit, attorneys' fees in class actions have ranged from 20%-50%."); *Dillworth v. Case Farms Processing, Inc.*, No. 5:08-cv-1694, 2010 WL 776933, at *7 (N.D. Ohio Mar. 8, 2010) (fee equal to 33% of settlement amount); *Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 WL 3862363, at *19 (N.D. Ohio Sept. 1, 2011) (fee equal to 29% of the settlement amount); *Clevenger v. Dillards, Inc.*, No. C-1-02-558, 2007 WL 764291, at *1 (S.D. Ohio Mar. 9, 2007) (fee equal to 29% of settlement fund). Importantly, here, Class Counsel's fees were not negotiated until after Class Counsel agreed upon Class Members' relief.

The proposed Notice Plan complies with Fed. R. Civ. P. 23 and due process because, among other things, it informs Class Members of: (1) the nature of the action; (2) the essential terms of the settlement, including the definition of the Settlement Class, the claims asserted, and the benefits offered; (3) the binding effect of a judgment if the Class Member does not request exclusion; (4) the process for objection and/or exclusion, including the time and method for objecting or requesting exclusion and that Class Members may make an appearance through

---

[7] Fed. R. Civ. P. 23(h)(1).

counsel; (5) information regarding the Class Representatives' request for an incentive award; (6) information regarding the payment of proposed Class Counsel fees; and (7) how to make inquiries. Fed. R. Civ. P. 23(c)(2)(B).

Accordingly, the Notice Plan and Settlement Notice "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc. v. Visa USA Inc.*, 396 F.3d 96, 114 (2d Cir. 2005). The manner of providing notice, which includes individual notice by mail to all Class Members who can be reasonably identified, represents the best notice practicable under the circumstances and satisfies the requirements of due process and Rule 23. *See Frost v. Household Realty Corp.*, 61 F. Supp. 3d 740, 745 (S.D. Ohio 2004); *see also Weinberger v. Kendrick*, 698 F.2d 61, 71 (2d Cir. 1982) (notice sent to individuals' last known address and notice published in the Wall Street Journal constituted adequate notice, even though some members of the class did not receive actual notice); *Jordan v. Global Nat. Res. Inc*., 102 F.R.D. 45, 51 (S.D. Ohio 1984) (due process does not require actual notice to all class members, and constructive notice by publication will suffice to inform potential class members). Thus, the Notice Plan should be approved. Fed. R. Civ. P. 23(c)(2)(A).

**B.  The Proposed Settlement Merits Preliminary Approval**

While the 2018 amendments to Rule 23 require courts to ask whether a proposed settlement is likely to win final approval, the preliminary approval standard remains "more lenient than the eventual standard required to grant final approval." Bolch Judicial Institute, Duke Law School, *Guidelines and Best Practices Implementing 2018 Amendments to Rule 23 Class Action Settlement Provisions* 2 (2018). A court is not required to consider all the final approval factors at this stage, *see Bailey v. Verso Corp.*, No. 3:17-CV-332, 2021 WL 673164, at

*3 (S.D. Ohio Feb. 22, 2021); however, those factors provide a helpful roadmap for the Court's analysis. *See also Vassalle*, 708 F.3d at 754 (quoting *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992)) (a district court is granted "'wide discretion in assessing the weight and applicability' of the relevant factors."). A review of those factors in this case shows why the Court should preliminarily approve the Settlement Agreement—because it is fair, reasonable, and adequate, and it will likely merit final approval.

### 1. Strength of the Class's Case

Plaintiffs believe that they have strong claims against Wells Fargo but none that are without significant risk. Most notably, Wells Fargo publicly admitted that it erroneously denied Class Members trial modifications even though each Class Member qualified for one. Wells Fargo followed its disclosure by sending apology letters and remediation payments to Class Members. Discovery showed that the Bank discovered the error in 2013, only partially fixed it in 2015, and did not fully fix it until 2018. Plaintiffs thus believe that they have a strong argument for liability.

Plaintiffs also assert that they have had strong arguments for their interpretation of the contract language at issue. The breach of contract claim was based on the Form Contract[8] allegedly obligating Wells Fargo to consider Plaintiffs and each member of the Class for a modification and to provide that loan modification if appropriate. Plaintiffs argued that Wells Fargo breached the Form Contract by failing to offer Class Members any temporary payment plan or a modification due to Wells Fargo's faulty automated calculation. Plaintiffs therefore believe that they have solid bases for their breach of contract claims. But as discussed below, *see infra* Section IV(B)(2), Wells Fargo had potentially viable legal defenses. Under the same set of

---

[8] As defined in the Third Amended Class Action Complaint (Doc. 42, Page ID# 777), Form Contract means "the uniform borrower assistance form and the Security Instruments underlying the mortgage, typically referred to as a mortgage, deed of trust, or security deed[.]"

facts, Plaintiffs also believe that they have a colorable basis for their claims of breach of the implied warranty of good faith and fair dealing arising from their contracts with Wells Fargo.

Plaintiffs also contend that their claims for Fraudulent Concealment and Intentional Infliction of Emotional Distress are well-grounded. On the other hand, these torts require a higher showing of knowledge and intent, making such claims more difficult to prove.

Plaintiffs also believed that they were very likely to succeed on their gross negligence and/or negligence claims. However, Plaintiffs recognize that the issue of what duty Defendant owed them is a question that would be hard-fought. Moreover, Plaintiffs recognize that Defendants would actively seek to dismiss their claims under statute of limitations defenses.

On balance, this factor weighs in favor of approval.

### 2. Risk, Complexity, Costs, and Likely Duration of Further Litigation

Almost all class actions involve high levels of cost, risk, and lengthy duration, which supports the Sixth Circuit's policy favoring and encouraging settlement. *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981). The fairness and adequacy of the settlement is underscored by consideration of the obstacles that the Class would face in ultimately succeeding on the merits, as well as the expense and likely duration of the litigation. *See Amos*, 2015 WL 4881459, at *1 ("In general, most class action are inherently complex, and settlement avoids the costs, delays, and multitude of other problems associated with them." (internal citations and quotations omitted)); *see also Brotherton*, 141 F. Supp. 2d at 905 (noting that adding any further delay to an 11-year-old case "would not substantially benefit class members" and would support a finding that the settlement was fair, reasonable, and adequate); *Miracle v. Bullitt Cty., Ky.*, No. CIV.A. 05-130-C, 2008 WL 3850477, at *6 (W.D. Ky. Aug. 15, 2008) (the "uncertainty of the outcome

of the litigation makes it more reasonable for the plaintiffs to accept the settlement offer from the defendant").

Here, although Named Plaintiffs believe their claims against Wells Fargo are meritorious and that the Class would ultimately prevail at trial, continued litigation against Defendants posed significant risks that made any recovery for the Class uncertain. To begin with, ongoing litigation would have required extensive, and expensive, discovery and contested briefing. Although the Parties might have been able to stipulate to the use of a significant amount of the discovery produced in the *Hernandez* case, much fact discovery—including deposition and document review—would be required before trial. Also before trial, extensive briefing on, among others, class certification and *Daubert* issues, would still need to take place. This would likely be followed by Rule 23(f) petitions, possible briefing and oral argument in the Sixth Circuit, likely motions to decertify and motions for summary judgment, all before trial and the attendant motions *in limine*. Each stage would have added risk and necessarily imposed delay before relief could be provided to the Class Members.

Case law additionally provided Wells Fargo with numerous arguments to prevail. As described above, the Class Representatives believed that Wells Fargo's calculation error breached the mortgage contracts and caused them resulting economic damages. On the other hand, while Wells Fargo admits that it erroneously denied trial loan modifications, it has pointed to case law challenging whether loan modifications were contracts, including whether the mutuality of obligation was ever met. Wells Fargo has also pointed to language in the relevant loan documents challenging Plaintiffs' construction of those documents. Wells Fargo continues to deny that the allegations based on purported violations of Freddie Mac, Fannie Mae, or FHA requirements provide a cause of action in Ohio or elsewhere in the nation. Wells Fargo also

argues that it did not have a legal duty to disclose and that its mistake cannot form the basis for an intentional infliction of emotional distress claim under Ohio law. In short, Wells Fargo would press substantial defenses to liability – and indeed had success on motions to dismiss in cases filed by Named Plaintiffs here.

Wells Fargo would also press substantial defenses to Class Members' damages. If Wells Fargo succeeded in convincing the Court that the only damages available were lost equity damages in the value of Class Members' properties, and that those can only be measured at the time of foreclosure, damages would be severely diminished for the Short Sale and Service Transfer Foreclosed Class Members, and likely precluded for the other members of the Class who did not lose their homes to foreclosure.

Class Representatives believe they had reasonably strong prospects of overcoming Wells Fargo's arguments and defenses, but there can be little doubt that those defenses presented the possibility that the Class would recover nothing if the case continued, or at least far less than what Class Representatives were seeking. This factor therefore weighs strongly in favor of approval.

### 3. Amount Offered in Settlement

"To determine whether a settlement 'falls within the range of possible approval,' courts focus on 'substantive fairness and adequacy' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.'" *Schuchardt v. Law Office of Rory W. Clark*, No. 15-cv-01329, 2016 WL 232435, at *10 (N.D. Cal. Jan. 20, 2016) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). "Immediate receipt of money through settlement, even if lower than what could potentially be achieved through ultimate

success on the merits, has value to a class, especially when compared to risky and costly continued litigation." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015).

The proposed Settlement provides substantial relief—$9,098,907 in direct payments to 1,830 Class Members. This amount is in addition to any remediation amounts Class Members receive from Wells Fargo. Borrowers who sold their homes via a short sale or who experienced foreclosure after Wells Fargo transferred servicing of their loans will receive a larger payment than borrowers who did not lose their homes. Specifically, short sale borrowers will receive the largest payment, a guaranteed payment of $19,000. The next category of borrowers were ultimately foreclosed upon *after* Wells Fargo sold their loans to another servicer, known as "Service Transfer Foreclosed." The guaranteed payment of $13,000 recognizes the loss of these borrowers' homes along with the intervening factor of another servicer between Wells Fargo's erroneous trial loan modification denial and the ultimate loss of the home.

Borrowers who did *not* lose their homes to foreclosure or experience a short sale—those in the "Active," "Paid in Full," and "Service Transfer Not Foreclosed" categories—will receive a flat payment of $5,000. This payment recognizes that Wells Fargo made an error by denying these borrowers the opportunity for a trial loan modification but is proportionally decreased to reflect the lesser impact as compared to borrowers who lost their homes through foreclosure or sold their home to avoid foreclosure (*i.e.* short sale). The final category, "sub mod," includes borrowers who were initially denied a trial loan modification by Wells Fargo but ultimately received a loan modification. These borrowers will receive a guaranteed $1,000 payment, commensurate with their lesser injury, a delayed modification rather than a wholly denied modification.

Notably, this Settlement provides *substantially* more relief than that approved in similar settlements involving wrongful loan modifications in the United States. For example, in *Chao v. Aurora Loan Services*, the Court approved a $5.25 million California class settlement for over 15,000 California borrowers who lost their homes to foreclosure after making payments under a voluntary forbearance agreement under the false hope that the lender would then provide a loan modification. No. C 10-03118 SBA, 2015 WL 294823 (N.D. Cal. Jan. 21, 2015). The gross settlement provided an average payment of $1,600 for one class of borrowers and payments of approximately $25 for the remaining borrowers. *Id.,* Dkt. 218 at 13.

In *Gaudin v. Saxon Mortg. Servs, Inc.*, the court approved a $4.5 million settlement on behalf of a class of 2,705 members who made at least three HAMP trial plan payments but were not offered a permanent loan modification and ultimately lost their homes to foreclosure. No. 11-cv-01663-JST, 2015 WL 7454183 (N.D. Cal. Nov. 23, 2015).

In *Wigod v. Wells Fargo Bank, N.A.*, the plaintiffs similarly alleged they made all required trial period payments but were not offered a permanent HAMP loan modification. *See* Case 1:10-cv-02348 (N.D. Ill.) at Dkts. 269, 274, and 277. The approved, claims-made settlement offered relief to 835 borrowers divided into three groups, based on whether each borrower was still in his or her home. Those whose homes were no longer serviced or held by Wells Fargo because of a foreclosure, short-sale, or service transfer, were eligible to receive a share of the $2 million fund based on "objective criteria," including "whether the borrower previously received a modification and whether the terms of the modification were more or less favorable than the terms the bank had promised them." *See* Dkt. 274-2 at 17 & Dkt. 274 at 7 (Motion for Final Approval, Oct. 17, 2014). At the time of final approval, 170 claims were submitted. The record does not clearly reflect the average claim amount but assuming a pro rata

payment, each borrower would have received approximately $11,800, less than the minimum payment here for similarly situated Class Members. *See id.* And for those whose homes had not been lost through one of these mechanisms and who were current on their mortgage, the settlement provided for a straight payment of $250 or a permanent loan modification. Dkt. 274 at 6-7. This is far less than the $1,000 to $5,000 that similarly situated Class Members in this case will receive under the proposed Settlement.

For these reasons, the amount offered in the Settlement favors preliminary approval.

### 4. Method of Distributing Relief

The 2018 amendments to Rule 23 instruct that the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, should be considered as part of the fairness inquiry. This factor supports approval because the proposed Settlement contemplates an efficient and effective distribution process.

Here, there is no claims process—Class Members will receive their settlement payments automatically in the mail, without the need to submit a claim.

### 5. Stage of the Proceedings and Extent of Discovery Completed

Here, Plaintiffs have engaged in substantial informal discovery wherein Defendant has made available to Class Counsel significant amounts of highly confidential and privileged material related to the 1,830 Class Members. This Settlement also benefits from the record developed in the *Hernandez* matter, as well as motion practice in the several related cases. This factor weighs in favor of granting preliminary approval.

### 6. Support of Experienced Counsel

Class Counsel wholeheartedly endorse the Settlement Agreement as fair, reasonable, and adequate. The Court should credit counsel's recommendation because it is the product of arm's

length negotiations before a federal magistrate judge and following relevant informal discovery. *See Linney v. Cellular Alaska P'ship*, Nos. C-96-3008 DLJ, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998) ("The involvement of experienced class action counsel and the fact that the Settlement Agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair.").

### 7. Attorney Fees and Costs

At this stage, courts do not formally consider whether to approve attorney fees. Nevertheless, in light of the amendments to Rule 23, the undersigned forecast the application for such payments.

As indicated above, Class Counsel intend to seek less than 25% of the total amount agreed upon to resolve this matter, which is well within the range of attorneys' fees approved by other courts in this Circuit. *See In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F. Supp. 148, 150 (S.D. Ohio 1986) ("typically the percentages range from 20% - 50%"); *Manners v. Am. Gen. Life Ins. Co.*, No. 3-98-0266, 1999 WL 33581944, at *29 (M.D. Tenn. Aug. 11, 1999) ("[T]hroughout the Sixth Circuit, attorneys' fees in class actions have ranged from 20%-50%."); *Dillworth v. Case Farms Processing, Inc.*, No. 5:08-cv-1694, 2010 WL 776933, at *7 (N.D. Ohio Mar. 8, 2010) (fee equal to 33% of settlement amount); *Brent v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 WL 3862363, at *19 (N.D. Ohio Sept. 1, 2011) (fee equal to 29% of the settlement amount); *Clevenger v. Dillards, Inc.*, No. C-1-02-558, 2007 WL 764291, at *1 (S.D. Ohio Mar. 9, 2007) (fee equal to 29% of settlement fund).

### 8. No Signs of Collusion

There are no signs of collusion here for three reasons.

*First*, the Settlement is the result of arms-length negotiations assisted by a mediator. Arm's-length negotiations conducted by competent counsel constitute prima facie evidence of fair settlements. *See, e.g., Roland v. Convergys Customer Mgmt. Grp. Inc*., No. 1:15-CV-00325, 2017 WL 977589, at *1 (S.D. Ohio Mar. 10, 2017) (noting that settlement was "reached after good faith, arms' length negotiations, warranting a presumption in favor of approval"); *Brotherton,* 141 F. Supp. 2d at 906 (absence of any evidence suggesting collusion or illegality "lends toward a determination that the agreed proposed settlement was fair, adequate and reasonable"); *Mangone v. First USA Bank*, 206 F.R.D. 222, 226 (S.D. Ill. 2001); 1 Herbert B. Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 11.41 at 90 (4th Ed. 2002). Notably, "[t]he participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties." *Bert v. AK Steel Corp.*, No. 1:02-CV-467, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008).

In this case, Parties engaged in protracted negotiations that took place over the course of multiple mediation sessions and ultimately reached an initial agreement during a second 12-hour long session mediated by Magistrate Judge Morton Denlow, an experienced mediator. After the first 13.5 hour-long mediation, counsel for both Parties spent significant time exchanging, reviewing, and analyzing additional data, all before the second 12-hour long mediation. Both Parties' counsel support the Settlement as fair and reasonable, and all certify that it was reached at arm's-length.

*Second*, Class Member settlement benefits will not revert to Wells Fargo under any circumstances.

*Third*, there will not be a disproportionate distribution of the settlement fund to counsel. As mentioned, counsel will not seek more than 25% of the total recovery.

For all these reasons, there is no cause for concern that the Settlement is the product of collusion.

### 9. Equitable Treatment of Class Members

The Settlement also "treats class members equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(D), including by considering Class Members' relative economic losses. *See id*. Here, payments will be divided proportionally based on the different categories of borrower, providing more to those who actually lost their homes following the erroneous trial modification denial.

In sum, the Court should preliminarily approve this Settlement because an analysis of the final approval factors show it will "likely be able" to grant final approval after notice is sent to Class Members. Fed. R. Civ. P. 23(e).

### VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the concurrently filed proposed preliminary approval order doing the following:

- certifying the Class for settlement purposes;

- preliminarily approving the Settlement;

- directing that notice be sent to Class Members;

- appointing the Named Plaintiffs as Class Representatives and their counsel as Class Counsel;

- appointing JND as the Class Action Administrator, and

- scheduling a final fairness hearing.

Respectfully submitted,

By: */s/ Marc E. Dann*
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
**DannLaw**
15000 Madison Avenue
Lakewood, OH 44107
Office: (216) 373-0539
Facsimile: (216) 373-0536
Email: notices@dannlaw.com

Christopher D. Stock (0075443)
Terence R. Coates (0085579)
**MARKOVITS, STOCK & DEMARCO, LLC**
3825 Edwards Rd., Suite 650
Cincinnati, Ohio 45209
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
Email: cstock@msdlegal.com
Email: tcoates@msdlegal.com

Gretchen Freeman Cappio**
Adele A. Daniel
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: gcappio@kellerrohrback.com
Email: adaniel@kellerrohrback.com

Alison E. Chase*
Matthew J. Preusch
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497
Email: achase@kellerorhback.com
Email: mpreusch@kellerrohrback.com

Richard M. Paul III*

Laura C. Fellows**
**PAUL LLP**
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Email: Rick@PaulLLP.com
Email: Laura@PaulLLP.com


Michael L. Schrag**
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
Email: mls@classlawgroup.com


*Pro hac vice forthcoming*
***Admitted Pro Hac Vice***
*Counsel for Plaintiffs and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2021, a true and accurate copy of the foregoing *Plaintiffs' Motion for Preliminary Approval* was filed electronically and served upon all parties via the Court's CM/ECF system.

/s/*Marc E. Dann, Esq.*
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Daniel M. Solar (0085632)
DannLaw
*Co-Counsel for Plaintiffs and the Putative Class*